**Murray A. KIVITZ, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 71–1602.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1972.

Decided Jan. 31, 1973.

Joseph A. Fanelli, Washington, D. C., for petitioner.

Jacob H. Stillman, Asst. General Counsel, Securities and Exchange Commission, with whom Walter P. North, Associate General Counsel and Michael J. Roach, Attorney, Securities and Exchange Commission were on the brief, for respondent.

Before DANAHER, Senior Circuit Judge, and McGOWAN and ROBB, Circuit Judges.

DANAHER, Senior Circuit Judge:

Before us is a petition to set aside a Commission order suspending for a period of two years the right of Petitioner Kivitz, an attorney,[1] to practice before the Commission. The order stemmed from the Commission's conclusion that Kivitz had engaged five years earlier in purportedly unethical and improper conduct unrelated to Commission practice.

## I

This whole episode arose from efforts of one Robert Ackles, president of Houses of Plastic, Inc. (hereinafter Plastic), to have processed through the Securities and Exchange Commission a satisfactory registration statement respecting a proposed offer of twelve million shares of Plastic stock at $1 per share. We are speaking specifically of the alleged wrongdoing on the part of Kivitz.

The Commission found, in essence, that Kivitz had allowed one Harold G. Quase, a layman, to set the terms of a proposed fee to be received by Kivitz. The Commission opinion correctly recognized that there was an "absence of direct testimony in the record that respondent agreed to divide the fee with Quase," but went on to observe that this was "not conclusive." The Commission opinion next recited that the record clearly supported the "inference" that Quase and Kivitz anticipated Quase would receive a portion of the Kivitz fee. There was no direct testimony on this point, either. The opinion continues that as a further part of the "inference" Kivitz was to allow Quase to receive a portion of the Kivitz fee "purportedly to pay for political influence to clear the registration statement to be prepared" by Kivitz. Neither "purportedly" nor otherwise can we find any evidence that Kivitz intended to share some portion of his fee to pay for political influence designed to secure SEC clearance for the registration statement in behalf of Plastic.

On the contrary, it developed according to the record, that Quase either in person or by telephone conversations with people interested in the Plastic program, had made various representations concerning his ability to promote the interests of Plastic and that one David Doane of Boise, Idaho, as attorney for Houses of Plastic, Inc., had come to Washington for the express purpose of a conference with Quase.

On the morning of October 29, 1964, Doane first went to the office of one Mary Jo Freehill, a public stenographer at the Mayflower Hotel. She telephoned to Quase, set up an appointment and then escorted him to the Quase office and introduced Doane. The latter warmly welcomed Attorney Doane. Quase exhibited one photograph of himself with President Kennedy and another with President Johnson. Described later by Doane as a "puffer," Quase boasted of his "organization" and of his alleged qualifications to undertake the promotion of the interests of Plastic respecting clearance of the registration statement which Ackles had vainly sought on two prior occasions.

Mrs. Freehill was later to testify that eventually a young man came and joined the conference. She had never met him and had never heard his name mentioned. For the record at the hearing she identified Kivitz.

Kivitz canvassed with Doane the inadequacies of the earlier documentation of the Plastic statement and Doane later testified that Kivitz was knowledgeable as to SEC problems. Quase talked of a retainer proposal which would involve a down payment of $20,000 with a further payment of $30,000 upon completion of the SEC filing with some stock allocation on a basis to be the subject of mutual agreement. He suggested that At-

---

1. Kivitz was admitted to the bar in the District of Columbia in 1951, had actively practiced before the Commission for some twelve years at the time of the events here in question, and so practiced thereafter. This court stayed the effectiveness of the Commission's order of suspension pending the instant review.

torney Doane and Kivitz work up a retainer letter-offer. Attorney Doane and Kivitz thereafter collaborated in the preparation of a proposal which outlined the basis upon which Kivitz would undertake preparation of an adequate registration statement.[2] The retainer called for a certified check to be made payable to Kivitz.

Plastic did not go through with the proposed arrangement. Kivitz filed no papers with the Commission. He received no fee. He divided nothing with Quase. Whatever representations Quase or anyone else might have made to Doane before the October 29, 1964 conference, there was no evidence whatever that Kivitz had any knowledge of such representations or that he had been a party to any prior conferences or that anyone had any authority to speak for him.

Attorney Doane, having secured the Kivitz retainer-offer [3] sought out an *ex parte* approach to a commissioner the very afternoon after his conference with Kivitz. The substance of what he then said was brought out by the Hearing Examiner as will be seen from Doane's testimony in our appendix to this opinion. *Five years* later, Kivitz found himself charged with unethical conduct, largely spelled out of representations of which he had no knowledge and attributable over a period of some two weeks either to or by people who, with one exception, Quase, were utter strangers to

him, and who had never even heard his name. He finally stood "convicted" despite his flat denial of culpable complicity.

## II

To bolster the case Commission counsel was seeking to establish through the testimony of Attorney Doane, there were offered in evidence statements of Mary Jo Freehill and other witnesses, and tape recordings of telephone conversations between various witnesses. Repeated objections by counsel for Kivitz stressed that such conversations failed to involve Kivitz in any way; it was never developed that he had knowledge of them, and there was nothing to show that Kivitz had been engaged in some joint venture with Quase. The Hearing Examiner overruled various objections observing "all of this evidence is being received subject to connection with the respondent, Mr. Kivitz; absent such a connection, the case would simply fail for want of proof." There was one person who might have testified, and that was Quase. Although summoned by the Commission staff, Quase appeared and refused to testify unless granted immunity. Counsel for the Commission declined to seek immunity for Quase.

The Hearing Examiner in his Initial Decision viewed the statements attributed to Quase, *e. g.*, as "verbal acts." Certainly to show the state of mind of Quase, the Examiner might as-

2. The Commission opinion speaks of "improper fee arrangements involving the proposed use of political influence to secure registration, and by the possible inclusion in the registration statement of financial statements prepared by an accountant willing to 'stretch a point.'" The Commission opinion refers to these aspects as "misconduct," which provides a "sufficient basis" for the Commission's disciplinary action.

There is no evidence that Kivitz at any time or in any way contemplated "proposed use of political influence to secure registration," no matter what Quase might have said. Moreover, when Attorney Doane and Kivitz worked up the proposed letter retainer, it is apparent

that both attorneys agreed that "Houses will provide, at its own cost, all required accounting statements . . . as may be needed for the Securities and Exchange Commission registration."

3. Doane then telephoned to Ackles in Michigan explaining in detail the terms of the proposed retainer letter and a basis upon which outside capital might become available. The tape of the telephone conversation further discloses that Doane reported the dealings so far as having been perfectly above board and across the table. He added that "it really doesn't look too bad to me because you don't have to, you don't have to sign anything or go on any proposition unless it's agreeable to you."

sess those representations as "statements and representations [which] were not hearsay." Were this a proceeding against Quase, the Examiner might have gone farther in this resort to and acceptance of what Quase had said. See 3d Ed. VI Wigmore, Evidence §§ 1766, 1789. Cf. Proposed Fed.R.Evid.Rules 801(c), 802, 803(3) and comment at 116. Here, however, it is abundantly clear that such evidence as to Kivitz was hearsay which went far beyond merely permissible circumstantial application. It was utilized to establish *testimonially* as true, the nature and the scope of the representations made by Freehill and Quase.

It is in this phase that we find Kivitz saddled by adverse evidence which never should have been received against him. His alleged complicity was being established from the very testimony, the admissibility of which we reject for it had never been connected up to him. The Supreme Court has pointed out that "men [are not] to be convicted on unsworn testimony of witnesses—a practice which runs counter to the notions of fairness on which our legal system is founded." Bridges v. Wixon, 326 U.S. 135, 153, 154, 65 S.Ct. 1443, 1452, 89 L. Ed. 2103 (1945).

For example, such use was made of the statements by Mary Jo Freehill as she escorted Ackles to the Quase office in mid-October. She told Ackles that Quase could "fix the thing" and that if Ackles were to achieve success at SEC, this was the "way" he would "have to go." Moreover, we find Quase telling Ackles that he had a "hick" lawyer, that Quase "had a direct line to the White House," and that if Ackles would "put up some money," he would have no problem. Indeed, Quase assured Ackles that he might as well quit unless Quase received money "to be put around to various people," and added that he knew where it should go.

We deem it indisputable that such statements, and others of like import, were used testimonially by the Examiner and later by the Commission to establish that Kivitz contemplated a division of fees with Quase with the intention that the latter was "to pay for political influence to clear the registration statement to be prepared by the respondent."

Simply to convey the flavor of what was happening here, testimony was received as to Doane's office conference two thousand miles away when his partner Manweiler returned to Boise with Ackles. Taped telephone conversations between Doane in Washington and Ackles in Michigan and between Quase in Washington and Doane in Boise were admitted. Since there was no suggestion whatever that Kivitz was a party to any such relationships, it is difficult to perceive how Kivitz could possibly protect himself by cross-examination or otherwise. Surely under such circumstances no inference can be drawn, with respect to culpability on the part of Kivitz, no matter what plans Quase might have conceived or what Doane said. Indeed the circumstances, everything considered and viewed in the light of the record in its entirety, even operate to reduce the quality and the weight of such competent evidence as was offered by Doane concerning his own part in the episode. The insubstantiality of the Commission's showing based upon such evidence is inevitably apparent.

On the other hand, during the 1969 hearing some seven character witnesses attested to the excellent professional reputation of Kivitz. During his eighteen years at the bar there had never been a complaint about his conduct in any respect. Throughout most of that period he had specialized in SEC practice. Never had he shared a legal fee with the promoter, Quase. On the contrary, Quase had referred to Kivitz as counsel, matters such as the formation of a corporation, a domestic relations problem and legal services for a company in which Quase was interested. Kivitz had been compensated in such instances.

Some might say that the good moral character of an attorney has no special

bearing on his life pattern until it becomes a point at issue, but it then may become controlling. Mr. Justice Black deemed evidence of good moral character favorably important in Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). Other courts have long been cognizant of the significance in human experience of good moral character. Indeed, the Supreme Court has said that under some circumstances "a man's reputation may be sufficient, by itself, to raise a reasonable doubt of his guilt." [4]

We think the Sixth Circuit put it just about right in Klopp v. Securities and Exchange Commission, 427 F.2d 455, 460 (6 Cir. 1970). There the court noted that an exemplary life "will stand a man in good stead when he is accused of shabby or criminal conduct which he denies, and when he is cast in a contest against accusers whose own lives present nothing special to support assertions of integrity. Character witnesses affirmed Klopp's good life and reputation until he fell afoul of the SEC."

So here.

### III

█ Of course, we quite understand as to matters arising under the Securities Exchange Act of 1934, that the findings of the Commission as to the facts "if supported by substantial evidence" shall be conclusive,[5] and that the issue of credibility is initially for the hearing examiner to resolve and then for the Commission.[6]

█ So to say is by no means the end of the matter. Instructed by Mr. Justice Frankfurter we know that we are not barred from setting aside an agency decision when, as a reviewing court, we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes," [7] including the body of evidence opposed to the agency's view. Certainly mere hearsay and emotional speculation are not to take the place of factual evidence. Rather,

> Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.[8]

Here we have not been confronted with an issue which depends upon the Commission's expertise so often involved in the agency's administration of its special field.[9]

4. Michelson v. United States, 335 U.S. 469 at 476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *and see* Weedin v. United States, 380 F.2d 657, 660 (9 Cir. 1967); Johnson v. United States, 269 F.2d 72, 74 (10 Cir. 1959).

5. 15 U.S.C. § 78y; *see* Hughes v. Securities and Exchange Commission, 85 U.S. App.D.C. 56, 61, 174 F.2d 969, 974 (1949).

6. *Cf.* Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 618, 619, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

7. Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

8. *Id.* 340 U.S. at 490, 71 S.Ct. at 466. *And see* Offutt v. United States, 348 U.S. 11, 15, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

9. *Cf.* Tashof v. Federal Trade Commission, 141 U.S.App.D.C. 274, 276, et seq., 437 F.2d 707, 709, et seq. (1970); WEBR, Inc. v. Federal Communications Commission, 136 U.S.App.D.C. 316, 320, et seq., 420 F.2d 158, 164, et. seq. (1969).

■ This was a non-public proceeding arising under Rule 2(e) of the Commission's Rules of Practice, 17 CFR 201.2(e). We do not say that an administrative agency may not so proceed, Schwebel v. Orrick, 153 F.Supp. 701 (1957), aff'd on other grounds, 102 U.S.App.D.C. 210, 251 F.2d 919, cert. denied, 356 U.S. 927, 78 S.Ct. 716, 2 L.Ed. 2d 759 (1958); Herman v. Acheson, 108 F.Supp. 723 (1952), aff'd sub nom., Herman v. Dulles, 92 U.S.App.D.C. 303, 205 F.2d 715 (1953). But we have always viewed an attorney's license to practice as a "right" which can not lightly or capriciously be taken from him. Laughlin v. Wheat, 68 App.D.C. 190, 191, 95 F.2d 101, 102 (1937); and see Willner v. Committee on Character, 373 U.S. 96, 102, 83 S.Ct. 1175, 16 L.Ed. 2d 224 (1963).

This disbarment case involves a lawyer's reputation in the community, his livelihood, his self-esteem—his "right." It is not concerned with some specialty developed in the administration of the Act entrusted to the agency. Rather, this case arises in an area we know something about. Every now and then any trial lawyer, any judge, may well draw upon situations he has seen develop within the purview of the observation of Chief Justice Warren in Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959), that often

. . . the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.

We think it not unreasonable—and here, quite apropos—to appraise what has happened in the words of Judge Major in General Foods Corp. v. Brannon, 170 F.2d 220, 225 (7 Cir. 1948):

. . . It is true, of course, as asserted by the government, that strict rules of procedure, including the admissibility of evidence, inherent in criminal and common law proceedings are not applicable to administrative proceedings. But no court, so far as we are aware, and we do not propose to be the first, has held in an administrative proceeding or any other kind that one person can be held responsible for the actions and statement of another in the absence of a conspiracy or agreement.

IV

■ According a fair estimate of the worth of the competent testimony of the witnesses to the case as a whole, taking account of the excellent professional standing of the petitioner, eliminating the inadmissible evidence which erroneously had been read against Kivitz, we "cannot conscientiously find that the evidence supporting" the Commission's position is "substantial," [10] as required by 15 U.S.C. § 78y. And see Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Accordingly we are bound to remand the case to the Commission with directions to vacate the order here challenged and to dismiss the proceeding as to Kivitz.

Reversed, for disposition accordingly.

---

10. "We are bound by the Board's findings of fact as to matters within its jurisdiction, where the findings are supported by substantial evidence; but we are not bound by findings which are not so supported. [Citations omitted.] The rule as to substantiality is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict. In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences." Appalachian Electric P. Co. v. National Labor R. Board, 93 F.2d 985, 989 (4 Cir. 1938), cited with approval in Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

APPENDIX

As Attorney Doane was concluding his testimony, Hearing Examiner Markun stated that he had one or two questions. Then the record shows the following:

HEARING EXAMINER MARKUN: Do I infer correctly that from some of your testimony that when you made your trip to Washington you were not doing it with a view to entering into a serious negotiation with Mr. Quase for his services in this matter, but instead you were coming here with a view to [329] garnering evidence against him for some purpose?

THE WITNESS: That is right.

HEARING EXAMINER MARKUN: When did this purpose or intention on your part become formulated?

THE WITNESS: It became formulated when we discussed it right after Mr. Ackles got back from Washington, D.C. He was so upset with the procedures and having talked to Dr. Quase, Dr. Quase had convinced him that the only way he going to get this done was by going through Dr. Quase's organization and that made him mad. Being a layman, not understanding these things, and that is when he made all of these remarks that made Quase mad back here about dealing with the Russians. He came home and he referred to Mr. Quase as a crook, or something to that effect, and he said either he ought to be put in jail or something. So we spent Saturday and Sunday, after I said I didn't believe Quase told you that, and we got the tape recording and, apparently, he did. And we spent Saturday and Sunday hunting out in the field and at that time, Ackles was torn between putting his product that he thought was going to be the great benefacting product in mankind for low cost housing, he was going to get that out with the help of a crook or else he was going to catch a crook and try to figure out how to do it some other way. And that is what was bothering him. And Mary Jo implied we might get it done with Quase's money.

HEARING EXAMINER MARKUN: When you came here, you [330] still were not certain how this would turn out, whether Quase would put up some money or not?

THE WITNESS: No, as far as I was concerned, I was not going to mess with Quase because I wanted to catch him—that was about the time Bobby Baker was going on and we didn't like the smell of that where I come from.

HEARING EXAMINER MARKUN: If Quase had not asked for $20,000 advance, would you have engaged him?

THE WITNESS: I might have for Ackles, but I would have disassociated my law firm from the operation. I don't want anything to do with him, anything more than Howard Manweiler did, but I did want to know what he was up to.

HEARING EXAMINER MARKUN: Ackles was willing to put up hard cash to have you come back here?

THE WITNESS: Yes, he was.

HEARING EXAMINER MARKUN: Before coming here, did either you or Ackles advise any Government agency of your purpose in this respect?

THE WITNESS: No.

HEARING EXAMINER MARKUN: When did you first advise any Government agency of what you were doing?

THE WITNESS: I told Mr. Budge about it.

HEARING EXAMINER MARKUN: How, at what time?

THE WITNESS: After we—after the morning—the conversation in Quase's office, on Thursay, October 29. The [331] only previous conversation, if you recall, I had with him was a telephone call. At that time, we had an idea about Quase.

HEARING EXAMINER MARKUN: You told Mr. Budge this after you first called to Michigan or prior to either of your two phone calls?

THE WITNESS: I told him that in person. I came out to his office after I

talked—after the afternoon conversation in Quase's office.

HEARING EXAMINER MARKUN: After the afternoon conference, was it before or after either of your calls?

THE WITNESS: It was in between.

HEARING EXAMINER MARKUN: It was between your two calls to Mr. Ackles?

THE WITNESS: Right.

HEARING EXAMINER MARKUN: On that day?

THE WITNESS: Yes.

HEARING EXAMINER MARKUN: What, precisely, did you tell Mr. Budge that your were doing?

THE WITNESS: I walked in and said, Homer, what kind of an outfit are you running. He says, what do you mean? I said, Howard Manweiler was just scared to death and he came back here and seen Howard (sic) before, and he said somebody told him they knew what he was doing every minute of the time he was here and he got in a plane and came home thoroughly disgusted.

My client got in a plane and came back to Boise, told [332] me that the only way he could get a SEC registration was to go through an outfit that was going to charge a whole lot of money and that he thought it was unreasonable, he thought it was not entirely within the law and he was upset with your outfit. And I get back here and it gets pretty well confirmed. And he said, what do you mean, you are implying there is bribing going on in the SEC? And I said that that is the implication. They put the money in the right places and distribute the fee in the right areas, I call—that is an implication. He said I want to know all about that. I said, I didn't come here to give it to you right now, but I will cooperate in any way. He said, you save those tapes and I said that I will. I said that I will be glad to turn over anything you want to your people or the FBI or anybody else. We didn't know who Quase was from Adam Stall. He said, if he is part of the Bobby Baker operation, if he is an independent, but somebody ought to investigate him. I didn't hear anything until the people in the SEC—I don't know which branch contacted me—asked me for the information. And then, I gave the information, as disclosed in the record, to both the SEC officials and the FBI.

This business of Mr. Murray Kivitz, that is an incidental development, a side issue, as far as I am concerned.

\* \* \* \* \* \*

[337] Q The only documentary evidence that you drew out of this meeting is a perfectly reasonable offer to a legitimate company, isn't it?

A Sure, that is what I would expect to come out of that [353].