**TOUCHE ROSS & CO., Edwin Heft, James M. Lynch and Armin J. Frankel, Plaintiffs-Appellants,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Roderick M. Hills, John R. Evans, Philip A. Loomis, Jr., and Irving M. Pollack, Members of the Securities and Exchange Commission, Defendants-Appellees.**

No. 155, Docket 78–6095.

United States Court of Appeals, Second Circuit.

Argued Oct. 30, 1978.

Decided May 10, 1979.

**572**

John M. Mahoney, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D.C. (Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, Frederic Townsend, Atty., Securities and Exchange Commission, Washington, D.C., on the brief), for defendants-appellees.

Milton V. Freeman, Washington, D.C. (Werner Kronstein, and Arnold & Porter, Washington, D.C.; Richard H. Murray, Milton S. Gould, Leon P. Gold, Ronald H. Alenstein, and Shea Gould Climenko & Casey, New York City; Karl Hirshman, James Pollock, and Sherburne Powers & Needham, Boston, Mass.; David R. Herwitz, Cambridge, Mass.; Sanford A. Bell and Lillian S. Weigert, New York City, on the brief), for plaintiffs-appellants.

Before KAUFMAN, Chief Judge, and TIMBERS and GURFEIN, Circuit Judges.

TIMBERS, Circuit Judge:

One of the most urgent problems of our day is the responsibility of the courts and other government bodies to prescribe high standards of conduct for their members and for those who practice before them. An indispensable corollary of this responsibility is the right—indeed, the duty—to discipline those who fail to conform to the high standards of conduct which have been prescribed.

We are called upon today to determine (1) whether the Securities and Exchange Commission ("SEC" or "Commission"), pursuant to one of its Rules of Practice which has been in effect for more than forty years, may conduct an administrative proceeding to determine whether certain professionals—in this case, accountants—should be censured or suspended from appearing or practicing before the Commission because of alleged unethical, unprofessional or fraudulent conduct in their audits of the financial statements of two corporations; and (2) if the Commission is authorized to conduct such an administrative proceeding, whether it should be permitted to conclude it before the accountants resort to the courts. For the reasons below, we hold that both questions must be answered in the affirmative.

I.

On September 1, 1976—more than two and one-half years ago—the SEC, pursuant to Rule 2(e) of its Rules of Practice, 17 C.F.R. § 201.2(e) (1978),[1] entered an order[2] which provided for a public administrative proceeding against the accounting firm of Touche Ross & Co. and three of its former partners, Edwin Heft, James M. Lynch and Armin J. Frankel. The firm and the three partners, all appellants, will be referred to collectively as "Touche Ross" or "appellants".

---

1. Rule 2(e) of the SEC's Rules of Practice in relevant part provides:

   "(e) *Suspension and disbarment.* (1) The Commission may deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice of and opportunity for hearing in the matter (i) not to possess the requisite qualifications to represent others, or (ii) to be lacking in character or integrity or to have engaged in unethical or improper professional conduct, or (iii) to have willfully violated, or willfully aided and abetted the violation of, any provision of the Federal securities laws (15 U.S.C. §§ 77a to 80b–20), or the rules and regulations thereunder."

2. *In the Matter of Touche Ross & Company, et al.*, Securities and Exchange Commission Proceeding No. 3–5075.

The proceeding was instituted to determine whether appellants had engaged in unethical, unprofessional or fraudulent conduct in their audits of the financial statements of Giant Stores Corporation and Ampex Corporation.[3]

The Commission's order alleged that Touche Ross and the individual appellants, in examining the companies' financial statements, had failed to follow generally accepted accounting standards and had no reasonable basis for their opinions regarding the financial statements of these companies. The order also recited that, if these allegations were found to be true, they tended to show that Touche Ross and the individual appellants had engaged in improper professional conduct and willfully had violated, and had aided and abetted violations of, §§ 5, 7, 10 and 17(a) of the Securities Act of 1933[4] and §§ 10(b) and 13 of the Securities Exchange Act of 1934,[5] and rules and regulations thereunder.

In view of the nationwide accounting practice of Touche Ross,[6] the SEC decided that it would be in the public interest to institute a public proceeding and to order a hearing at which Touche Ross would be afforded an opportunity to present a defense to these charges.[7] The Commission then would have been in a position to determine whether the substantive allegations were true and, if so, whether Touche Ross and the individual appellants should be disqualified, either temporarily or permanently, from appearing and practicing before the Commission.

No administrative hearings have ever been held in this case.

On October 12, 1976, Touche Ross commenced the instant action for declaratory and injunctive relief in the Southern District of New York, naming as defendants the Commission and four of its members in their official capacities. By this action, Touche Ross sought a permanent injunction against the on-going administrative proceeding which had been instituted against them by the SEC pursuant to Rule 2(e). Touche Ross also sought a declaratory judgment that Rule 2(e) had been promulgated "without any statutory authority"; that the Rule 2(e) administrative proceeding had been instituted against them "without authority of law"; and, in any event, since the SEC does not constitute an impartial forum for the adjudication of the issues raised in the SEC's Rule 2(e) order, that such administrative proceedings would deny Touche Ross due process of law.

The SEC moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1) on the grounds that Touche Ross' complaint failed to state a claim upon which relief could be granted and that the court lacked subject matter jurisdiction over the asserted claims for relief. The crux of the SEC's position in support of its motion to dismiss was that Touche Ross improperly had failed to exhaust administrative remedies.

---

3. With regard to the financial statements of Giant Stores for 1972, the Commission's order alleged that Giant Stores had overstated its net income by failing to record certain accounts payable accrual and by recording fictitious credits. The order alleged that Touche Ross, in examining these financial statements, permitted the use of accounting principles not generally accepted, placed excessive reliance on the representations of Giant Stores' management, and that its report on Giant Stores' financial statements was "materially false and misleading."

With regard to the financial statements of Ampex for 1971, the order alleged that the statements were inaccurate with respect to allowances for doubtful accounts receivable, current royalty commitments and losses arising out of certain licensing agreements. The order alleged that Touche Ross failed to examine these statements in accordance with generally accepted accounting standards and that its report on the Ampex financial statements was "materially false and misleading."

4. 15 U.S.C. §§ 77e, 77g, 77j, 77q(a) (1976).

5. 15 U.S.C. §§ 78j(b), 78m (1976).

6. Touche Ross is a partnership of certified public accountants. There are 525 partners and principals, and approximately 4500 other professional employees. The firm has offices located in 37 states.

7. Rule 2(e)(7) provides that all hearings under Rule 2(e) shall be non-public unless the Commission directs otherwise.

After a hearing, the district court, Constance B. Motley, *District Judge,* filed a well-reasoned opinion granting the SEC's motion and ordering that the action be dismissed. [1978 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,415 (S.D.N.Y. April 24, 1978). The district court rested its decision on the failure of Touche Ross to exhaust its administrative remedies. It did not reach the substantive question of the validity of Rule 2(e).[8]

From the judgment entered on the district court opinion, this appeal has been taken.

## II.

In the light of these facts and prior proceedings, we turn first to the question whether appellants must exhaust their administrative remedies before resorting to the courts to assert their claims.

In order to avoid confusion, we distinguish among three possible situations in the context of the instant case where the exhaustion issue arises: (1) when a litigant, such as Touche Ross, seeks to challenge a final Commission decision and order pursuant to Rule 2(e) which imposes sanctions or disciplines professionals for improper or unprofessional conduct; (2) when a litigant, such as Touche Ross, seeks judicial review of claims of agency bias; and (3) when, as in the particular circumstances of this case, Touche Ross requests this Court to adjudicate the question whether the Commission has the *authority* to promulgate Rule 2(e) and to proceed thereunder. With respect to claims (1) and (2), we agree with the district court that Touche Ross must first exhaust their administrative remedies before challenging a Commission determination on the merits, or raising claims of agency bias. With respect to claim (3), however, because there is no need for further agency action to enable us to reach the merits of appellants' challenge to the Commission's authority to promulgate Rule 2(e), we hold, with regard to this claim alone, that appellants need not exhaust their administrative remedies.

■ The doctrine of exhaustion of administrative remedies is concerned mainly with the timing of judicial review. In general, a litigant is required to pursue all of his administrative remedies before he will be permitted to seek judicial relief. The rationale behind the exhaustion doctrine is that a court's refusal to intervene prematurely in the administrative process gives the agency an opportunity to develop factual findings, to apply its expertise to new issues and to exercise its discretionary powers. *See McKart v. United States,* 395 U.S. 185, 193–94 (1969). Moreover, "[n]otions of administrative autonomy require that the agency be given a chance to discover and correct its own errors"—a practice that will protect the integrity of the administrative process and prevent litigants from flouting the agency's procedures. *Id.* at 195. We emphasize at the outset that normally we will not tolerate the interruption of the administrative process to hear piecemeal appeals of a litigant's claims on the merits. This is exactly what the exhaustion doc-

---

**8.** The district court succinctly summarized its holding as follows:

"Touche Ross has not shown that its procedural due process rights will be infringed by the SEC's Rule 2(e) proceeding. Nor has it shown that another constitutional right is at stake. Its allegations that the SEC is acting in clear violation of its statutory authority are not supported by precedent. The court finds that there has been no showing of clear abuse of authority by the SEC. Touche Ross has not shown that it will suffer irreparable injury if forced to present its jurisdictional claims to the SEC and then to the reviewing court, in the event of an adverse determination by the SEC.

The court finds that Touche Ross has not made a sufficient showing that this court should depart from the general rule requiring exhaustion of administrative remedies.

Therefore, without reaching the substantive question of the validity of Rule 2(e), the court holds that Touche Ross must first exhaust its administrative remedies. Therefore the SEC's motion to dismiss the complaint is granted. See order of this date." *Touche Ross & Co. v. SEC, supra,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,415 at 93,-503.

trine was designed to prevent. Accordingly, we wish to make it clear that Touche Ross must exhaust their administrative remedies by submitting to the Rule 2(e) proceedings before we will consider any challenges which they may assert with respect to any disciplinary action that the Commission may determine is appropriate under the circumstances.

Appellants' principal claim on the instant appeal is that the Commission is acting without authority and beyond its jurisdiction in proceeding against them pursuant to Rule 2(e). They also contend that the administrative proceedings should be enjoined because the Commission is "biased", as indicated by the institution of public rather that non-public proceedings;[9] they argue that, because the proceedings are public, they will not be given a fair and impartial hearing in accordance with due process.

If the claim of bias were the only basis for appellants' demand for injunctive relief, it would be unnecessary for us to go further than to hold, with respect to that claim, that exhaustion of administrative remedies is required. As the Court of Appeals for the District of Columbia Circuit has held, allegations of agency bias or prejudgment based on ex parte communications are insufficient for injunctive relief and cannot be reviewed until the agency has made an adverse determination and an appeal has been taken raising these claims on the record as a whole. *R. A. Holman & Co. v. SEC*, 299 F.2d 127, 129 (D.C.Cir.), *cert. denied*, 370 U.S. 911 (1962); *National Lawyers Guild v. Brownell*, 225 F.2d 552, 555 (D.C.Cir.1955), *cert. denied*, 351 U.S. 927 (1956). We agree. Until the Commission has acted and actual bias has been demonstrated, the orderly administrative procedures of the agency should not be interrupted by judicial intervention.

Appellants, however, go further and contend that the SEC, in promulgating Rule 2(e), acted in excess of its statutory authority and now is proceeding against them without jurisdiction. Thus, the question presented is whether "the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted", *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938) (footnote omitted), is applicable here.

The Supreme Court has acknowledged that the exhaustion doctrine is subject to a number of exceptions, *McKart v. United States, supra*, 395 U.S. at 193, and an examination of the cases indicates that it has not been applied consistently. Perhaps the leading case in which the Supreme Court refused to require exhaustion is *Leedom v. Kyne*, 358 U.S. 184 (1958). The question in *Leedom* was whether the National Labor Relations Board had acted in excess of its delegated powers by failing to conduct a vote of all professional employees as required by § 9(b)(1) of the National Labor Relations Act before certifying a particular bargaining unit consisting of both professional and nonprofessional employees. The Supreme Court, in dispensing with the exhaustion requirement, held:

"This suit ˙ . . . is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act. Section 9(b)(1) is clear and mandatory. It says that, in determining the unit appropriate . . . 'the Board *shall not* (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion. . . .' Yet the Board included in the unit employees whom it found were not professional employees after refusing to determine whether a majority of the professional employees would 'vote for inclusion in such unit.' Plainly, this was an attempted exercise of power that had been specifically withheld." 358 U.S. at 188–89 (emphasis in original).

**9.** *See* note 7, *supra*.

The exception resorted to in *Leedom*, however, has been interpreted narrowly by our Court. In *Sterling Drug, Inc. v. Weinberger*, 509 F.2d 1236 (2 Cir. 1975) (Friendly, J.), in rejecting plaintiffs' claim that *Myers* is "old-hat" and that *Leedom* "has become the seminal decision", we held:

> "Nothing advanced by plaintiffs persuades us to depart from the general position we took after full analysis, only two years ago, that the most that can be extrapolated from *Leedom v. Kyne*, is that an injunction may be issued 'if an agency refuses to dismiss a proceeding that is *plainly* beyond its jurisdiction as a matter of law or is being conducted in a manner that cannot result in a valid order' . . .—a 'possibly over-generous' standard we found not to have been met by the plaintiff there. Until otherwise instructed we shall continue to regard *Myers* as stating the general rule and *Leedom v. Kyne* as being what the Supreme Court says it is—a narrow exception." *Id.* at 1239 (footnotes omitted) (emphasis added).

In the instant case, the authority of the Commission to proceed pursuant to Rule 2(e) surely is not "plainly beyond its jurisdiction as a matter of law".[10] Unlike the Board's action in *Leedom*, the action of the Commission in promulgating Rule 2(e) is not specifically *prohibited* by statute. Viewing appellants' claim in the light most favorable to them, it may be said that the Commission's authority to promulgate Rule 2(e) is not specifically *provided for* by statute.

■ While our decision in *Sterling Drug* makes it clear that we are loath to extend the *Leedom* exception to situations where the plaintiffs do not allege that an agency is acting "plainly beyond its jurisdiction", we also have recognized that application of the exhaustion doctrine requires " 'an understanding of its purposes and of the particular administrative scheme involved.' " *Diapulse Corp. v. Food & Drug Administration*, 500 F.2d 75, 77 (2 Cir. 1974), *quoting from McKart v. United States, supra,* 395 U.S. at 193. Among those purposes outlined by the Court in *McKart*, are giving the agency an opportunity to develop a factual record, permitting it to exercise its discretion or to apply its expertise, and promoting efficiency by barring the premature interruption of the administrative process which would follow if the parties were permitted to seek aid from the courts at various intermediate stages. *Id.* at 193–94. In applying these considerations to the actual question in *McKart*, the Court considered a number of factors before concluding that exhaustion should not be required. In particular, the Court weighed the hardship faced by appellant in going to jail,[11] the fact that the issue there

10. The district court below held that the proper standard for judicial intervention is a finding that the agency has acted in "flagrant" violation of its statutory authorization. *Touche Ross & Co. v. SEC, supra*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,415 at 93,499. In view of our holding that several factors should be considered in determining whether exhaustion is required, we find it unnecessary to determine whether the standard employed by the district court is the same as "plainly" beyond the agency's jurisdiction.

11. Decisions of our Court previously have suggested in dictum that appellants must make a showing of irreparable injury before we will dispense with the exhaustion requirement. *E. g., M. G. Davis & Co. v. Cohen*, 369 F.2d 360, 363 (2 Cir. 1966). *Cf. Small v. Kiley*, 567 F.2d 163, 165 (2 Cir. 1977) (plaintiff's failure to exhaust administrative remedies precludes finding of either irreparable harm or likelihood of success on the merits). In *M. G. Davis & Co., supra*, the challenge to the agency's authority involved a question of procedural irregularity which we held did not suffice to demonstrate "the kind or degree of over-stepping of the limits of the Commission's power which would bring it within . . . an exception" to the exhaustion requirements. 369 F.2d at 363. However, in dictum we stated:

> "Even if appellants could surmount the jurisdictional hurdle, their action must fail, because they do not allege that they would be irreparably injured if denied relief. In the absence of a clear showing that they would be injured . . . appellants must exhaust their administrative remedies." *Id.*

While this element of irreparable injury does not appear to be required by the Supreme Court in order to avoid exhaustion, the courts have emphasized the harm that a litigant will sustain if forced to exhaust. *See, e. g., McKart v. United States, supra; International Waste*

required only statutory interpretation and that there was no need for agency expertise or the exercise of agency discretion. The Court concluded that, since "judicial review would not be significantly aided by an additional administrative decision, . . . [t]here is simply no overwhelming need for the court to have the agency finally resolve this question in the first instance." *Id.* at 199. The Court also emphasized, however, that, if the exercise of discretion or application of expertise is required, "[i]t may be proper to require a registrant to carry his case through the administrative process before he comes into court." *Id.* at 200. Indeed, subsequently in *McGee v. United States*, 402 U.S. 479 (1971), the need for the selective service board's application of expertise in determining whether a person could claim exemption as a ministerial student or conscientious objector was decisive in requiring exhaustion.

The absence of the need for agency expertise or discretion has proven decisive in several decisions of our Court which have held that exhaustion was not necessary. In *Finnerty v. Cowen*, 508 F.2d 979 (2 Cir. 1974), appellant, a recipient of benefits under the Railroad Retirement Act, challenged the Railroad Retirement Board's procedure for recouping alleged overpayments on the ground that the procedure violated the relevant statutes and regulations and denied her due process because she received no prior notice or opportunity for a hearing. Although we recognized that normally exhaustion is required for recipients who challenge the merits of an administrative determination, we held that exhaustion would be futile when the "very administrative procedure under attack is the one which the agency says must be exhausted." *Id.* at 982–83. Since there was no need for the agency to make determinations of fact or to apply its expertise before the federal courts could determine the constitutionality of the administrative procedure, exhaustion was not required.

Similarly, in *Diapulse Corp. v. Food & Drug Administration, supra,* where the question was whether the FDA's proposed search fees were legally authorized, we held that exhaustion was not required. There was no need for the development of a factual record, no room for the exercise of agency discretion, and little need for agency expertise in deciding the question. Accordingly, we concluded that "[t]o require exhaustion . . . would be overly harsh and wasteful." 500 F.2d at 78.

Similar considerations are present in the instant case. Appellants challenge the legal authorization of the Commission to proceed against them pursuant to Rule 2(e). While the Commission's administrative proceeding is not "plainly beyond its jurisdiction", nevertheless to require appellants to exhaust their administrative remedies would be to require them to submit to the very procedures which they are attacking.

Moreover, the issue is one of purely statutory interpretation. *See Consumers Union v. Cost of Living Council*, 491 F.2d 1396, 1399 (Temp.Emer.Ct.App.), *cert. denied*, 416 U.S. 984 (1974). Further agency action is unnecessary to enable us to determine the validity of Rule 2(e). There is no need for the exercise of discretion on the part of the agency nor for the application of agency expertise. While the Commission has the power to declare its own rule invalid, it is unlikely that further proceedings would produce such a result. Accordingly, we now turn to the merits of that question.

### III.

■ Section 23(a)(1) of the 1934 Act, 15 U.S.C. § 78w(a)(1) (1976), authorizes the Commission to "make such rules and regulations as may be necessary or appropriate to implement the provisions of this title for which [it is] responsible or for the execution of the functions vested in [it] by this title . . . ." [12] Pursuant to this general

---

*Controls, Inc. v. SEC*, 362 F.Supp. 117, 120 (S.D.N.Y.), *aff'd*, 485 F.2d 1238 (2 Cir. 1973); *Gellis v. Casey*, 338 F.Supp. 651 (S.D.N.Y. 1972). The nature of the injury should be one

of several factors taken into account in considering whether to require exhaustion.

**12.** Congress has given the Commission similar rulemaking powers in each of the other stat-

rulemaking authority, the Commission adopted and subsequently has amended [13] Rule 2(e) of its Rules of Practice, 17 C.F.R. § 201.2(e) (1978), the relevant part of which is set forth above. *See* note 1, *supra.*

The current Rule and its predecessors have been in effect for over forty years. It has been the basis for a number of disciplinary proceedings brought against professionals—including accountants and attorneys—during this forty year period. *See, e. g., Touche Ross & Co.,* Accounting Series Release No. 153, Fed.Sec.L.Rep. (CCH) ¶ 72,175 (1974) (firm waived formal Rule 2(e) proceedings, was censured by Commission, and consented to an order providing remedial sanctions); *In the Matter of Myers,* Accounting Series Release No. 92, Fed.Sec.L.Rep. (CCH) ¶ 72,114 (1962); *In the Matter of Touche, Nevin, Bailey & Smart,* Accounting Series Release No. 78, Fed.Sec.L.Rep. (CCH) ¶ 72,100 (1957); *In the Matter of Masquelette & Co.,* Accounting Series Release No. 68, Fed.Sec.L.Rep. (CCH) ¶ 72,087 (1949); *In the Matter of Logan,* 10 S.E.C. 982 (1942) (accountants disciplined under Rule 2(e)); *In the Matter of Ronald H. Freemond,* Release No. 33–

4736 [1964–1966 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 77,190 (1964); *In the Matter of Schwebel,* 40 S.E.C. 347 (1960) (attorneys permanently disqualified from practice before the SEC under Rule 2(e)).

■ Although the mere fact that the Rule is of long standing does not relieve us of our responsibility to determine its validity, *see SEC v. Sloan,* 436 U.S. 103 (1978), it is noteworthy that no court has ever held that the Rule is invalid. Indeed, in *SEC v. Ezrine,* Civil Action No. 72–3161, [1972–1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,594 (S.D.N.Y. Aug. 3, 1972), Judge Frankel specifically rejected an attorney's claim that the Commission lacked the power to discipline him, granted the Commission's request for an injunction, and enjoined the attorney from further practice before the Commission. *See also Schwebel v. Orrick,* 153 F.Supp. 701, 704 (D.D.C.1957) (district court upheld authority of Commission to proceed under Rule 2(e), *affirmed on other grounds,* 251 F.2d 919 (D.C.Cir.) (denial of injunction affirmed but on ground that appellant failed to exhaust administrative remedies), *cert. denied,* 356 U.S. 927 (1958).

utes which it is responsible for administering. *See, e. g.,* Section 19 of the Securities Act of 1933, 15 U.S.C. § 77s (1976); Section 20 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79t (1976); Section 319 of the Trust Indenture Act of 1939, 15 U.S.C. § 77sss (1976); Section 38 of the Investment Company Act of 1940, 15 U.S.C. § 80a–37 (1976); Section 211 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–11 (1976).

**13.** In 1935, shortly after it was created, the Commission promulgated its Rules of Practice. Rule II(1) originally provided that the Commission in its discretion could discipline attorneys or other persons who did not possess the requisite qualifications to represent others before the Commission. *See* Securities and Exchange Commission, First Annual Report 45–53 (1935). Rule II was amended in 1938 to eliminate the provision that persons wishing to practice before the Commission were required to file applications with the Commission. The disciplinary provision, however, was retained. Securities Act Release No. 1761 (June 27, 1938).

Appellants contend that the enactment in 1965 of 5 U.S.C. § 500, eliminating federal agency practice *admission* requirements, demonstrates the intent of Congress to strip the

SEC of any authority to discipline professionals practicing before it. The stated purpose of the section was quite to the contrary. It was intended to ensure that persons appearing before the agencies *be represented by attorneys of their choice.* H.R.Rep.No.1141, 89th Cong., 1st Sess. (1965), *reprinted in* [1965] U.S.Code Cong. & Ad.News 4170, 4171. Moreover, the statute explicitly provides in § 500(d)(2) that the section "*does not* . . . authorize or limit the discipline, including disbarment, of individuals who appear in a representative capacity before an agency. . . ." (emphasis added). We find nothing in this language to support appellants' contentions. The language, as appellants acknowledge, is "neutral". It neither authorizes nor limits the power of the agencies to discipline professionals who appear or practice before them; that was not the purpose of the section. And there certainly is nothing to suggest that Congress intended to limit disciplinary proceedings to those agencies with specific statutory authorization to do so. *See, e. g.,* 111 Cong.Rec. 27193 (Oct. 18, 1965); S.Rep.No.755, 89th Cong., 1st Sess. 5 (1965), *reprinted in* [1965] U.S.Code Cong. & Ad.News 4170.

Other courts, although not squarely ruling on the question, nevertheless have intimated that the Commission has the authority to promulgate Rule 2(e) and to discipline professionals who appear before it. *See, e. g., SEC v. Csapo,* 533 F.2d 7, 12 (D.C.Cir. 1976) (Lumbard, J.) ("Nothing in our opinion today is intended to limit the right of the SEC to institute itself such disciplinary proceedings. . . ."); *Kivitz v. SEC,* 475 F.2d 956, 962 (D.C.Cir.1973) (Danaher, J.). These decisions, although persuasive, are not binding on this Court. We must examine independently the statutory scheme to determine if the Rule is in accordance with Congressional policy and purpose. *See SEC v. Sloan, supra,* 436 U.S. at 115–16.

Appellants concede that there is no express statutory prohibition against promulgation of the Rule. They contend, however, that the statutory scheme negates any implied authority that the SEC may discipline accountants pursuant to Rule 2(e). Specifically, they point to § 27 of the 1934 Act, 15 U.S.C. § 78aa (1976), which provides that the district courts "shall have *exclusive* jurisdiction of violations of this chapter" (emphasis added).[14] Viewed in conjunction with other statutory provisions which authorize the SEC to commence proceedings in the district courts to enjoin what the Commission believes to be violations of the Acts,[15] appellants argue that these provisions indicate that Congress intended that only the courts should adjudicate violations of the Acts. Absent express Congressional authorization for the Commission to adjudicate such violations—so the argument goes—the Commission is without power to promulgate its disciplinary Rule.

We reject appellants' argument for several reasons. First, it is clear that the SEC is not attempting to usurp the jurisdiction of the federal courts to deal with "violations" of the securities laws. The Commission, through its Rule 2(e) proceeding, is merely attempting to preserve the integrity of its own procedures, by assuring the fitness of those professionals who represent others before the Commission. Indeed, the Commission has made it clear that its intent in promulgating Rule 2(e) was not to utilize the rule as an additional weapon in its enforcement arsenal, but rather to determine whether a person's professional qualifications, including his character and integrity, are such that he is fit to appear and practice before the Commission. Securities Act Release No. 5088 at 1 (Sept. 24, 1970).

▪ Moreover, an examination of the policies underlying the securities laws indicates that, contrary to appellants' assertions, the Rule is not inconsistent with the Commission's statutory authority. In considering questions of the authority of an agency to promulgate rules or regulations, the Supreme Court has held that, if the regulation is in furtherance of a legitimate statutory purpose, the validity of the regulation will be upheld. In *Mourning v. Family Publications Services, Inc.,* 411 U.S. 356 (1973), the Court stated:

> "Where the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.' " *Id.* at 369, *quoting from Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–81 (1969).

If the powers exercised by the agency constitute a " 'legitimate reasonable and direct adjunct to the Commission's explicit statutory power' ", *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 655 (1978), *quoting from United States v. Chesapeake & Ohio Railway Co.,* 426 U.S. 500, 512 (1976), then an express grant of authority is not neces-

---

**14.** A similar provision is Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a) (1976).

**15.** *E. g.,* Section 21(e) of the 1934 Act, 15 U.S.C. § 78u(e) (1976); Section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1976).

sary to sustain the validity of the challenged rule or regulation.[16]

In the general rulemaking provisions of the federal securities laws,[17] Congress has provided the Commission with "broad authority" to adopt those rules and regulations necessary for carrying out the agency's designated functions. *See, e. g., Commercial Capital Corp. v. SEC,* 360 F.2d 856, 857 (7 Cir. 1966). Congress realized that it could not enact express statutory provisions to deal with every possible evil that might develop. Thus, the wide latitude given to the Commission has been seen as necessary, "in view of the nature of the subject matter, . . . to protect investors against fraud or deception made possible by constantly changing conditions." *R. A. Holman & Co. v. SEC, supra,* 299 F.2d at 132. Indeed, in discussing the role of the SEC in the enforcement of the Foreign Corrupt Practices Act, Congress implicitly gave its approval to the SEC's use of Rule 2(e) proceedings as a possible alternative to injunctive action or criminal referral. *See* S.Rep. No.95–114, 95th Cong., 1st Sess. 12 n.6 (1977); H.R.Rep.No.95–640, 95th Cong., 1st Sess. 10 n.1 (1977), *reprinted in* [1977] U.S. Code Cong. & Ad.News 4098.

The chief purpose of the 1933 Act was to "provide investors with full disclosure of material information concerning public offerings of securities in commerce." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 (1976). One of the mechanisms designed to implement this policy of full disclosure was the requirement that a registration statement be filed with the Commission before a security could be sold to the public. *See SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1025 n.51 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071 (1979). In connection with the filing requirements, the Commission was given broad authority to regulate the contents of the filings, including the authority to prescribe the form and method of preparing financial statements, to define accounting terms,[18] and to require that financial statements be certified by an independent public accountant.[19]

The role of the accounting and legal professions in implementing the objectives of the disclosure policy has increased in importance as the number and complexity of securities transactions has increased. By the very nature of its operations, the Commission, with its small staff and limited

---

**16.** Relying on *Wallach v. SEC,* 202 F.2d 462 (D.C. Cir. 1953), and, more generally, the recent decision in *SEC v. Sloan,* 436 U.S. 103 (1978), appellants contend that, unless Congress expressly authorizes an agency to exercise disciplinary powers, the implication of such powers is contrary to the statutory scheme. The question in *Wallach* involved the extent to which former § 15(b)(4) of the 1934 Act could be used by the Commission to discipline nonregistered salesmen of a registered broker-dealer. The section expressly authorized the SEC to revoke or suspend the registration of any broker or dealer who had been found to have committed violations. In *Wallach,* however, the Commission had attempted to extend the rule to persons other than those specifically encompassed by the section. The Court held that the action was in plain violation of the statutory language and in excess of the limited authority granted therein.

*Sloan* involved a challenge to the Commission's authority pursuant to § 12(k) of the 1934 Act, to "tack" 10 day summary orders suspending the trading of shares beyond the initial 10 day period. The Court held that § 12(k) should not be read any more broadly than its language and the statutory scheme permitted.

These two decisions are distinguishable from the instant case. In *Wallach* the Commission relied on an express statutory section as a predicate for its attempted authority to discipline nonregistered salesmen. Here, however, the Commission relies on its general rulemaking authority. Thus, while the Commission's action in *Wallach* was contrary to an express limitation in the statute, here the rule neither violates, nor is inconsistent with, any statutory provision. Moreover, an examination of the purposes of the securities laws indicates that, unlike the provision challenged in *Sloan,* Rule 2(e) is consistent with the entire statutory scheme.

**17.** *See* note 12, *supra,* and accompanying text.

**18.** Section 19 of the 1933 Act, 15 U.S.C. § 77s (1976). *See also* Section 13(b)(1) of the 1934 Act, 15 U.S.C. § 78m(b)(1) (1976).

**19.** *See* Items 25, 26 and 27 of Schedule A to the Securities Act of 1933, 15 U.S.C. § 77aa(25), (26) and (27) (1976); Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a) (1976).

resources, cannot possibly examine, with the degree of close scrutiny required for full disclosure, each of the many financial statements which are filed. Recognizing this, the Commission necessarily must rely heavily on both the accounting and legal professions to perform their tasks diligently and responsibly. Breaches of professional responsibility jeopardize the achievement of the objectives of the securities laws and can inflict great damage on public investors. As our Court observed in *United States v. Benjamin,* 328 F.2d 854 (2 Cir.), *cert. denied,* 377 U.S. 953 (1964), "In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar."

Rule 2(e) thus represents an attempt by the SEC essentially to protect the integrity of its own processes. If incompetent or unethical accountants should be permitted to certify financial statements, the reliability of the disclosure process would be impaired.

These concerns have led courts to reject challenges to the authority of other agencies to discipline attorneys practicing or appearing before them. In *Goldsmith v. Board of Tax Appeals,* 270 U.S. 117 (1926), the Supreme Court upheld the power of the Board of Tax Appeals to adopt rules of practice for professionals appearing before it as a necessary adjunct to the Board's power to protect the integrity of its administrative procedures and the public in general. Focusing on the character of work done by the Board, the interests affected by its decisions, and the "quasi judicial" nature of its duties, the Court rejected the argument that the absence of explicit statutory authorization to regulate the conduct and admission of attorneys was an indication that Congress did not intend the Board to exercise such power. Instead, the Court stated that "so necessary is the power and so usual is it that the general words by which the Board is vested with the authority to pre-

scribe the procedure in accordance with which its business shall be conducted include as part of the procedure rules of practice for the admission of attorneys." *Id.* at 122.

Similarly, in *Herman v. Dulles,* 205 F.2d 715, 716 (D.C.Cir.1953), the Court of Appeals for the District of Columbia Circuit held that, since the International Claims Commission had been given the "express authority to 'prescribe such rules and regulations as may be necessary to enable it to carry out its functions'", it therefore had implied authority to prescribe rules setting standards of practice and adopting procedures for disciplining attorneys who failed to conform to those standards. *Accord, Koden v. United States Department of Justice,* 564 F.2d 228 (7 Cir. 1977) (upholding the authority of the Immigration and Naturalization Service to discipline attorneys appearing before it).

Appellants attempt to distinguish *Goldsmith* and *Herman* from the instant case on the ground that the agencies involved in those cases exercised only "judicial functions", whereas the SEC, according to appellants, is authorized to act only as an enforcement agency.[20] Assuming arguendo the correctness of appellants' restrictive description of the SEC's functions, it is uniformly accepted that many agencies properly combine the functions of prosecutor, judge and jury. Indeed, the Supreme Court has held that a hearing conducted by such a body does not automatically constitute a violation of due process. *Withrow v. Larkin,* 421 U.S. 35, 47–50 (1975). *Accord, Wright v. SEC,* 112 F.2d 89, 94 (2 Cir. 1940). Appellants nevertheless argue—we think facetiously—that permitting the SEC to discipline attorneys who appear before it would be equivalent to empowering United States Attorneys to disbar lawyers who represent clients in criminal prosecutions in the federal courts. Aside from the obviously inapt analogy, this contention at most merely suggests the possibility that the

---

**20.** As we are sure appellants' lead counsel recalls, the SEC is a quasi-legislative, quasi-judicial and quasi-executive agency. It has been so recognized throughout the 45 years of its existence.

power to discipline may be abused; it is wide of the mark of suggesting a reason for invalidating the Commission's rule. As the Court stated in *Withrow v. Larkin, supra,* 421 U.S. at 47:

> "The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

To summarize: we reject appellants' assertion that the Commission acted without authority in promulgating Rule 2(e). Although there is no express statutory provision authorizing the Commission to discipline professionals appearing before it, Rule 2(e), promulgated pursuant to its statutory rulemaking authority, represents an attempt by the Commission to protect the integrity of its own processes. It provides the Commission with the means to ensure that those professionals, on whom the Commission relies heavily in the performance of its statutory duties, perform their tasks diligently and with a reasonable degree of competence. As such the Rule is "reason-

ably related" to the purposes of the securities laws. *Mourning v. Family Publications Service, Inc., supra.* Moreover, we hold that the Rule does not violate, nor is it inconsistent with, any other provision of the securities laws. We therefore sustain the validity of the Rule as a necessary adjunct to the Commission's power to protect the integrity of its administrative procedures and the public in general. *Goldsmith v. Board of Tax Appeals, supra.*

Accordingly, we hold that the district court properly refused to enjoin the Commission from proceeding against Touche Ross pursuant to Rule 2(e). We affirm the judgment dismissing the action. In view of our holding that Rule 2(e) represents a valid exercise of the Commission's rulemaking power, appellants must exhaust their administrative remedies before the SEC prior to attempting to obtain judicial review of their other claims, including their claim that the Commission is acting with bias and will not afford them a fair hearing in accordance with due process.[21]

We affirm the district court's dismissal of the action.

IRVING R. KAUFMAN, Chief Judge (with whom TIMBERS, Circuit Judge, joins) concurring:

I concur fully in the splendid opinion of Judge Timbers. I wish simply to underscore one salient fact.

The corollary of the doctrine of exhaustion of administrative remedies is the precept that judicial review of final agency

---

**21.** Touche Ross chose to remain loyal to its retired partners and to challenge Rule 2(e) in a broadside attack on the right of the Commission to discipline *anyone.* Our opinion today rejects this sally. Nothing in the complaint, or the district court proceedings, or the briefs and oral argument before us purports to raise the question of the extent to which the Commission has the power, in a disciplinary action, to hold Touche Ross and its 525 partners vicariously liable to the extent of permanent revocation of the right to practice for the acts of its erstwhile partners. It may be argued, for example, that the Commission may not proceed against Touche Ross on a theory of *respondeat superior* without first establishing that Con-

gress has delegated such authority and that the Commission has, through a rulemaking proceeding, set standards for such an adjudication, including a definition of "willful conduct" by organizations. *See generally Fuller, The Forms and Limits of Adjudication,* 92 Harv.L.Rev. 353, 373 (1978). We express no view on this question, but it is one that the Commission might want to consider. In any event, since it is far from clear that the Commission will in fact determine to discipline Touche Ross, and since the question was *not* raised before the Commission or this court, the resolution of such issues should await the conclusion of the administrative process.

action is always available. Any party who is aggrieved by disciplinary action taken by the Securities and Exchange Commission may file a petition in the Court of Appeals to set aside or modify its order. *See* 15 U.S.C. § 78y; *Kivitz v. SEC,* 154 U.S.App. D.C. 372, 475 F.2d 956 (1973).

To be sure, the initial responsibility for finding facts and reaching a decision rests with the administrative agency. And, given the deference properly accorded expertise in this field, the Commission's findings and choice of sanctions will often be upheld on review. *See, e. g., Sinclair v. SEC,* 444 F.2d 399, 402 (2d Cir. 1971) (*per curiam*) (discipline of order clerk employed by broker-dealer); *Gross v. SEC,* 418 F.2d 103 (2d Cir. 1969) (discipline of vice president of broker-dealer).

"The appellate process, though," as I had occasion to observe recently, "is hardly a toothless animal; it is able to excise not only error but also bias, impropriety, irrationality, and abuse of discretion." Kaufman, *Chilling Judicial Independence,* 88 Yale L.J. 681, 707 (1979). In the context of SEC disciplinary proceedings, the courts have not remained idle when an examination of the record as a whole fails to support the Commission's findings, *see, e. g., Buchman v. SEC,* 553 F.2d 816, 820 (2d Cir. 1977); *Kivitz v. SEC, supra,* 475 F.2d at 961, or when the sanctions imposed are adjudged to have been too severe. *See Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 183–85 (2d Cir. 1976), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). And it follows naturally that if sanctions are unjustifiably extensive in scope—*e. g.,* embracing every partner despite the isolated transgressions of a few—the corrective process of judicial review may be called into play.[1]

Our opinion today affirms the ability of the SEC to ensure that the professionals who practice before it—on whose probity the viability of the regulatory process depends—meet the highest ethical standards. The assertion of that authority is consistent with the underlying purposes of the securities laws, and manifests the wisdom of the congressional decision to vest wide rulemaking authority in the Commission. But in recognition that any power may be misused, dispassionate panels of Article III judges stand ready to correct the occasional excesses and errors that are an inevitable part of the administrative process.

---

1. I do not, of course, intend to intimate any views concerning the merits of the case before us; indeed, on the record we have, it would be impossible to hazard so much as a guess.