**WEBR, Inc., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Florian R. BURCZYNSKI, etc., d/b/a Ultravision Broadcasting Co., Intervenor.**

No. 22526.

United States Court of Appeals
District of Columbia Circuit.

Argued June 5, 1969.

Decided Aug. 14, 1969.

Mr. Aloysius B. McCabe, Washington, D. C., with whom Mr. Robert A. Beizer, Washington, D. C., was on the brief, for appellant.

Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Robert N. Green, Washington, D. C., for intervenor.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

TAMM, Circuit Judge.

When this court sits in review of orders of administrative agencies, it must be fully cognizant of the limits of its authority. We are, therefore, aware of the teaching of Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed.2d 456 (1951), which states that where an agency's decision finds substantial support in the record of proceedings, this court may not interpose its power to overturn that decision. Realizing this and taking account of the fact that an agency exists solely for the purpose of effectuating the many policy determinations of Congress in the area of regulated industry, we affirm the order of the Federal Communications Commission. We believe this action is warranted upon a full review of the record in light of our understanding of the broad purpose of the Federal Communications Act.

The record discloses that appellant, WEBR, Inc. (hereinafter "WEBR"), and intervenor, Ultravision Broadcasting Company (hereinafter "Ultravision"), filed mutually exclusive applications for a construction permit for a new ultra-high frequency (UHF) television station to be located in Buffalo, New York. These applications were designated for hearing to determine, *inter alia*, which of the applicants, comparatively speaking, would better serve the public interest under the license, and, with regard to Ultravision, whether it was financially qualified. Subsequently, on March 21, 1966, after the hearing had begun, the Commission's Review Board granted both parties' petitions to enlarge the scope of the hearing to include determinations regarding the basic character qualifications of Ultravision and also whether WEBR improperly failed to notify the Commission of its interest in a CATV system. With respect to the character qualifications, the Review Board ordered that the proceeding be enlarged to determine

whether Stanley Jasinski, co-partner of Ultravision * * * wrote a false memorandum purporting to relate a conversation on March 16, 1965, with Sister Mary Angela, President of Rosary Hill College, concerning the use of the college facilities for the proposed television station and to determine further whether Stanley Jasinski falsely testified with respect to the alleged conversation at the hear-

ing in this proceeding * * * (J.A. 103).

It was further ordered that the hearing be enlarged to determine

> whether the partners of Ultravision * * * failed to perform the responsibilities of continuing accuracy and completeness of information furnished in a pending application as required by Commission policy by their failure to amend the Seaport Broadcasting Corporation broadcast application to reflect changes in ownership after Anthony M. Glieco and Daniel N. Glieco disassociated themselves from the corporation * * * (J.A. 103).

Thereafter, on August 26, 1966, upon the conclusion of the enlarged hearing, the trial examiner released his Initial Decision. He concluded that Ultravision was financially qualified for the license; that a substantial preference would be accorded to Ultravision in the area of integration of ownership in the management of the station; and that, in the area of ownership of media for the mass dissemination of news and information, Ultravision was substantially preferred. The examiner concluded that WEBR should be given a substantial preference in the matter of area coverage and a minor preference in population coverage. With respect to each applicant's past performances in broadcasting, the examiner noted that neither applicant should be preferred, nor was either applicant placed ahead of the other with regard to its proposed programming. As to the character issues, the examiner found that the Seaport Broadcasting Corporation should have complied with the Commission's policy and amended its broadcast application to reflect the change in ownership. However, he found that such neglect was not governed by a specific rule until some months after the event complained of and that, in any event, it was "highly unlikely" that the amendment would have served to alter the ultimate grant to Seaport. In discussing the primary character issue, the examiner found and concluded that the evidence did not support a finding that Stanley Jasinski knowingly and intentionally prepared and submitted a false memorandum, nor did he knowingly and willfully testify falsely as to that memorandum. Finally, the examiner assessed a substantial demerit against WEBR for its failure to comply with the Commission's Rule 1.65 by not reporting its involvement in a CATV system. Upon these conclusions the examiner found that "the public interest, convenience and necessity [would] be served by a grant of the Ultravision Broadcasting Co. application * * *." (Supp. App. 480.) [1]

Thereafter, on October 21, 1966, the Commission's Broadcast Bureau received certain information regarding the veracity of Jasinski's testimony. Upon receipt of this information the Bureau caused an investigation to be undertaken in Buffalo which uncovered information which the Bureau believed tended to discredit Jasinski's hearing testimony. Armed with this "new evidence" the Broadcast Bureau petitioned the Commission's Review Board to reopen the record for the purpose of clarifying the character issue disposed of in the hearing examiner's Initial Decision. On January 24, 1967, the Review Board denied the petition on the grounds that it was untimely and that no justification had been advanced for such lateness. The Review Board pointed out that the character issue had been fully developed before the hearing examiner and that the Bureau, in the exercise of reasonable diligence, had ample time (from December, 1965, to October, 1966) to obtain this information which formed the basis for the petition to reopen. "Hearings," asserted the Board, "must end at some time, and on this issue that time has come" (J.A. 143).

---

1. For the complete text of the hearing examiner's Initial Decision *see* 11 F.C.C. 2d 426 (1966).

On January 31, 1967, WEBR filed a petition with the Commission to review the Board's denial of the Bureau's petition to reopen. This petition found the support of the chief of the Broadcast Bureau as well as the opposition of Ultravision. On April 12, 1967, the Commission, with one Commissioner dissenting, dismissed the petition as premature.

■ On August 17, 1967, oral argument was had before the Review Board on WEBR's exceptions to the Initial Decision. Subsequently, on January 11, 1968, the Board upheld the examiner's grant of the license to Ultravision. The Review Board did, however, assess a comparative demerit against Ultravision in the matter of the Seaport controversy. Still, the Board felt that this demerit was offset by WEBR's violation of Rule 1.65. In any event, upon a full discussion of the comparative qualifications, the Board found that Ultravision would best serve the public interest and ordered its application to be granted.[2] WEBR petitioned the Commission for review —which petition was denied and thus this appeal.

## I. THE CHARACTER ISSUE

### A. The "Conflict in Testimony"

■ It is the position of the appellant that the Commission's Review Board failed to recognize and resolve a conflict in testimony concerning a disputed material fact—such fact being critical to the determination of Ultravision's character qualifications. Initially it must be pointed out that the question of whether there was a "conflict" in testimony is not one of law but of fact to be resolved by the trier of fact after a full analysis of the evidence. It is he who has the opportunity to observe the witnesses, to sift out testimony taking account of emphasis, innuendo or evasion. It is for him to judge who is biased and who is equivocating. Judges in their chambers view a cold record—one devoid of emotion and full contextual impact. What might appear on a typed page as a conflict could, at the hearing, be evidence of an accord. For a reviewing court to substitute its judgment on a factual issue for that of the agency is a usurpation of the prerogative and duty of that body. We said in Mansfield Journal Co. (FM) v. FCC, 86 U.S.App.D.C. 102,

---

2. For full text of the Review Board's decisions see 11 F.C.C.2d 394 (1968).

We note, in this regard, that we are troubled by the apparent premise of the Board's decision and the Commission's affirmance—that one or the other of the applicants had to get this license. The Commission obviously was concerned over WEBR's extensive control over the media in the Buffalo area and while it settled upon Ultravision for the award, it is conceivable that it did so with significant reliance on the assumption that the license had to issue. We remind the Commission that the appropriate consideration is what the public interest dictates. If that interest commands a withholding of the license from all applicants either because of a too-extensive media control or because of questionable character qualification, then the Commission must disallow the permit until qualified application is made. This is so even though the Commission seems to suggest that some UHF channels are so experimental and, as yet, so financially unrewarding that they may lie unallocated

for long periods of time if the Commission does not permit issuance to applicants who are less than wholly qualified. As to this suggestion let us first say that the prospect of a "dark" channel is not nearly as disturbing as a channel allocation to an unqualified licensee, especially given the Commission's traditional reluctance to reclaim a license once issued. Second, the Commission's own statistics belie the premise of this argument. Buffalo is the 21st largest market for television stations. There is, in the top 25 markets, a total of 91 UHF channels allocated. Of these, 38 are already on the air; 39 are already authorized but not yet on the air; eight are applied for; and only six channels are completely available. FCC, TV Allocations and Channel Usage in 100 Largest TV Markets as of May 31, 1969. Our review of this record, however, does not convince us that the Commission overstepped its broad line of discretion. We merely indicate, by this note, where that line has been drawn.

110, 180 F.2d 28, 36 (1950), that the "credibility of the witnesses who testified * * * [before the Commission] is, of course, a question for the Commission." This no more than restated what the Supreme Court has held time and time again. In a labor dispute case the Court, in 1941, made it clear that "Congress entrusted the Board [National Labor Relations Board], not the courts, with the power to draw inferences from the facts * * *. The Board, like other expert agencies dealing with specialized fields * * * has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony." NLRB v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368. This "No Court's Land" of administrative law is also embodied in Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(e) (Supp. IV, 1965–68), and based as it is on comity and the orderly administration of justice in the regulatory field, we do well to heed it.

Turning then to the particulars of this issue we note that 'the document responsible for triggering this conflict was one of forty memoranda of contacts between the Ultravision principals and Buffalo community leaders. This particular memorandum is evidence of a contact or conversation between Stanley Jasinski and Sister Mary Angela, President of Rosary Hill College, on March 16, 1963. In substance it relates the interviewer's (Jasinski's) conclusions based upon his conversation. He concluded that Rosary Hill College was on the threshold of expansion; that Sister Mary Angela felt that television would bring the needs of the college to the attention of a great number of people; that Rosary Hill College was willing to do periodic productions in the arts for the station with the aid of teachers and the college glee club; and that the college, in concert with a neighboring institution, would be willing to do dramatic presentations.[3] This exhibit was sub-mitted by Ultravision's counsel on June 26, 1964. Thereafter, on December 3, 1965, Jasinski testified before the hearing examiner that to the best of his knowledge the contact with Sister Angela took place in the evening in one of the campus rooms during a fathers' day or fathers' club meeting (J.A. 154). He said that they had talked and that the Sister knew of his involvement in the television proceedings (J.A. 154). "Fifty or sixty people" were in the room at this social event (J.A. 155). He noted that it was not Sister Angela who had advised him of the willingness of the dramatic club to participate; rather, he said, it was the director of that department (J.A. 155). He stated that he had talked, on numerous occasions, to other people at the college (J.A. 156). Several days later Jasinski testified that he had met the Sister socially on a number of occasions and that she knew him through his daughter, a graduate of Rosary Hill (J.A. 178).

In an effort to rebut and discredit this testimony, WEBR called Sister Angela on December 10, 1965. Upon being asked, she stated that she did not have an interview with Jasinski on March 16, 1963, nor, to the best of her knowledge, had she ever discussed the participation of the college in local live television programs (J.A. 182). She related that she had never told Jasinski that the college would be willing to produce periodic shows in the arts or that Rosary Hill would be willing to do dramatic presentations on the station (J.A. 183). She testified that there was no fathers' club meeting on March 16, 1963, and that, to the best of her knowledge, she had "never been approached by Mr. Jasinski." (J.A. 183–84.) She did confirm the fact that Jasinski's daughter had been a student at the college but she stated that, with the exception of a telephone conversation, she had never talked to this man (J.A. 186–87). With regard to this telephone conversation, Sister Angela disclosed that on June 10,

---

3. For full text of this contact memorandum *see* J.A. 49.

1964, upon discovering the existence of the memorandum of contact, she had called one of the other principals of Ultravision to protest the compromising position in which she had been placed by Jasinski. She said that her call was returned by Jasinski and that she had protested the fact that he had placed her in "a compromising position" with the newspaper (Buffalo Courier-Express, Inc., the parent company of WEBR) with which she, as president, needed to have at least good public relations (J.A. 187).

Subsequent to this testimony the scope of the hearing was enlarged, as before mentioned, to include the character issue raised by this "conflict of testimony" (J.A. 103). In due course, an enlarged hearing was held. This time, however, Sister Angela testified for Ultravision. It was then that she qualified her earlier testimony with regard to her possible associations with Jasinski. She said that she would qualify her earlier statement (as she had done previously) and say that she had never had an *interview* with him. She did say, however, that she could have met him on a social occasion when there were lines of people, *"50 or 60 people"* (emphasis supplied; J.A. 225). She further testified that, while she had no recollection of having *met* him, she might have had an occasion to shake his hand at a social event. She also testified a second time that there had been no fathers' club meeting on March 16, 1963, but there had been one some five days later at which she was not in attendance (J.A. 244–45).

 The foregoing paraphrase of the testimony of these participants, together with the contact memorandum, serves as the basis for WEBR's claim that a significant and substantial conflict existed on the record and that the failure of the Board to either recognize or resolve this conflict amounted to plain error. This argument, however, somewhat obscures the basic issue brought out by these proceedings—that issue being whether Jasinski testified falsely with respect to the questioned contact memorandum. Section 308(b) of the Federal Communications Act of 1934, 47 U.S.C. § 308(b) (1964), provides that an applicant for a license must submit proof of his good character. The case law under this section has made it clear that the Commission may weigh misrepresentations of fact by an applicant against his character qualifications. *See, e. g.,* Charles P. B. Pinson, Inc. v. FCC, 116 U.S.App.D.C. 106, 321 F.2d 372 (1963). However, questions respecting misrepresentations of fact are, perforce, fact questions peculiarly within the province of the Commission to consider. As long as the Commission is cognizant of the issue raised and, upon the record, reasonably resolves that issue on behalf of an applicant, this court will not, and cannot, set that determination aside. We are satisfied, therefore, that the Board took note of the variances brought out in the testimony of these witnesses and considered them fairly on the basis of the record and upon the hearing examiner's personal observations of the declarants. We note, as the Board did, that the memorandum of contact disclosed only that Sister Angela "felt" that television could result in a greater number of people showing a greater interest in helping Rosary Hill College and that it would serve as a vehicle to enable the college to reach a vast number of people who would be generous in assisting Rosary Hill. We note that these "feelings" of Sister Angela were never denied by her. Furthermore, it was to Rosary Hill College (not to Sister Angela) that Jasinski ascribed the willingness to participate in his proposed programs. In this regard he testified that he had talked with many persons connected with the college. With respect to Jasinski's testimony that his meeting with Sister Angela took place in the evening on March 16, 1963, at a fathers' day or fathers' club meeting at which 50 or 60 people were in attendance, we note that Sister Angela testified that it was possible that she

could have met him on a social occasion at which "50 or 60" people attended. Furthermore, although there was no fathers' club meeting on March 16, 1963, there was one on March 21, 1963. This testimony, in addition to certain statements by the Sister indicating her fear of losing the good will of the Courier-Express, owned and published, as has been said, by the parent company of WEBR, the Buffalo Courier-Express, Inc., such good will being necessary in the college's plans for expansion, and certain testimony of the Sister's physician regarding her emotional make-up leaves this court unable to say, as a matter of law, that the Board's conclusion that Jasinski did not testify falsely before the hearing examiner is unsupported by the record. "[T]he fact that we might not have made the same determination on the same facts does not warrant a substitution of judicial for administrative discretion since Congress has confided the problem to the latter." FCC v. WOKO, Inc., 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204 (1946). Accordingly, we uphold the Commission in this regard.

## B. *The "Petition to Reopen"*

■ Proceeding then to the argument of WEBR that the Board's failure to reopen the record after the issuance of the Initial Decision amounted to plain error, we find that some two months after that decision had been rendered, the Broadcast Bureau moved the Board to reopen the record to explore newly discovered evidence (J.A. 125). In that motion it was indicated that although Mr. Jasinski testified that he had spoken to the director of dramatics regarding Rosary Hill College's participation in dramatic presentations on the proposed television station, an affidavit from this individual contradicted that testimony. Additionally, the motion disclosed that certain investigations by the Bureau had uncovered statements by persons connected with the college which also ran contrary to Jasinski's testimony. It was on these disclosures that the Bureau urged that additional testimony should be taken to explore the character issue further. As before noted, the Board denied this motion on the grounds that it was untimely and that no true justification had been made to warrant a reopening. We find that the record supports such a denial.

■■ The general rules of practice and procedure before the Commission provide that an application for review of an Initial Decision must be filed within thirty days from its issuance. P & F Radio Reg., Current Service ¶ 51:115 (d) (1963). Also, "[n]o evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission believes should have been taken in the original proceedings shall be taken on any rehearing * * *." P & F Radio Reg., Current Service ¶ 51:115(j) (1963). These two provisions were obviously intended to promote administrative finality and should be overridden only upon a showing of particular cause and sufficient justification in the public interest. Here such cause was found not to exist. It is uncontroverted that the petition to reopen the proceedings was filed more than two months after the Initial Decision. Moreover, the evidence proffered was only "new" with respect to the *time* WEBR and the Bureau were able to secure it. This evidence existed prior to the original hearing and the Bureau had ample opportunity and ample notice to obtain it. Jasinski had testified on a number of occasions that he had talked with persons associated with the college and, also, that he had discussed programming with the drama director. These disclosures, then, were not newly discovered "evidence but, rather, evidence easily discoverable initially, and apparently only now deemed crucial by appellant when seen from the highland of hindsight." Guinan v. FCC, 111 U.S. App.D.C. 371, 376, 297 F.2d 782, 787 (1961). However, the appellant argues that this court's decision in WMOZ, Inc. v. FCC, 120 U.S.App.D.C. 103, 344 F.2d

197 (1965), makes it abundantly clear that where affidavits are submitted after the Initial Decision which tend to discredit evidence received at the original hearing, the Commission must, as a matter of law, grant the petition to reopen. Our review of *WMOZ, Inc.*, on the other hand, discloses that the evidence proffered there was of such a nature as to add an element to the proceedings which had gone unnoticed at the original hearing and would, if believed, "have gone far toward undermining the basis for the Commission's conclusions * * *." 120 U.S.App.D.C. at 104, 344 F.2d at 198. Furthermore, in that case we left the decision as to the weight to be accorded this *new* testimony to the Commission, saying only that it was enough "that a full record * * * may advance the interests of justice." *Id.* Here, however, no new element was added. Instead, the Broadcast Bureau sought only to explore the character issue further —an issue that had been covered in depth in the original proceeding. In addition, this evidence, if believed, would not "have gone far toward undermining" the groundwork of the Commission's decision. The Commission had before it a full record on all pertinent issues. It weighed the numerous exhibits and the examiner's findings and conclusions in the public interest and found the Bureau's petition unpersuasive. The Bureau and WEBR had failed to show a "compelling" circumstance to justify a reopening of the record or to overbear "the need for administrative finality." *See* Florida Gulfcoast Broadcasters, Inc. v. FCC, 122 U.S.App.D.C. 250, 252, 352 F.2d 726, 728 (1965); Kidd v. FCC, 112 U.S.App.D.C. 288, 289, 302 F.2d 873, 874 (1962).

■ Finally, we feel that the Board's handling of this case was fully in accord with its earlier announced policy toward "late-filed" petitions set forth in Edgefield-Saluda Radio Co., 8 P & F Radio Reg.2d 611 (1966). There the Board noted that "it would improve and expedite our disposition of these untimely petitions * * * to initiate a practice of considering the late-filed petition to the extent that serious public interest questions are raised." *Id.* at 614–615 n.3. The Board initiated this approach only after recognizing that its earlier practice of denying these petitions for procedural untimeliness was unsatisfactory. Our inspection of the Board's order reveals that it went beyond its earlier, less enlightened practice and considered the instant petition in accordance with the spirit of *Edgefield-Saluda* to the extent that it found no justification for a reopening. This finding was within that broad area of administrative discretion and, finding no patent abuse, we are unable to alter it.

## C. *The "Seaport Controversy"*

In WEBR's assault on the Commission's order, a significant blow is directed at the failure of the Commission to disqualify Ultravision for its principal's deception regarding an earlier proceeding. That proceeding involved the application of the Seaport Broadcasting Corporation (hereinafter "Seaport"), of which Jasinski is the principal stockholder, for a construction permit for a new standard broadcast station to be located at Lancaster, New York. After a requisite hearing, owing to the fact that more than one applicant had come forward for this frequency, the examiner issued his Initial Decision (J.A. 83–100; released Dec. 19, 1962). There he found that a competing applicant, one WEXC, Inc., was "slightly" preferred in the area of comparative coverage due to the fact that it would reach 44,000 more people through its broadcasts than Seaport (J.A. 98). WEXC was also substantially preferred over Seaport in the area of past broadcast experience of its principals. On the other hand, Seaport was given a "distinct preference" with regard to the participation of its principals in local community affairs "as well as the preference found for [Seaport] in the area of integration of ownership with management" (J.A. 98). Among the individuals who would so participate were two brothers—Anthony and Daniel

Glieco—who were owners of a gasoline station in nearby Buffalo. The brothers, the examiner found, would participate in the day-to-day management of the station. It was further found that Seaport was to be accorded a "strong" preference in the area of "planning and preparation" with regard to the needs of the area of intended coverage (J.A. 99). Finally, Seaport's programming proposals were "substantially" preferred to the extent that they were accorded "especial significance" (J.A. 99). It was concluded, therefore, that "the strong preference held by Seaport in 'preparation and planning' together with the substantial preference for Seaport in the important area of programming [were] regarded by the Examiner as tipping the scales of comparison in favor of the Seaport application * * *" (J.A. 99). WEXC, Inc., took exception to the examiner's decision but before that could be acted upon, the Commission remanded the case to the examiner in October, 1963, in order to develop a record regarding issues not here pertinent.

On or about March 5, 1964, before the issuance of any supplemental initial decision, Anthony Glieco notified Jasinski that he and his brother "wish[ed] to redeem [their] stock * * *" (Supp. App. 457). Jasinski immediately notified his counsel in Washington, D.C. of this turn of events and subsequently, on March 20, 1964, at a meeting of the Board of Directors of Seaport, accepted the Gliecos' resignation and bought out their interests (Supp.App. 457). In the meantime, between the March 5 notification and the March 20 buy-out, the hearing examiner held a conference on March 12 and admonished the applicants to come forward with any relevant information for he wished to close the record. Jasinski and his counsel remained silent. Thereafter, on March 23, 1964, the examiner issued his Supplemental Initial Decision reaffirming his earlier findings and upholding the grant of the permit to Seaport. Following this WEXC, Inc. and Seaport executed a buy-out agreement and Seaport's application was finally approved by the Review Board on June 4, 1964. On July 2, 1964, Seaport filed a statement with the Commission showing, for the first time, the Glieco transaction.

In the present proceeding Jasinski testified to the events before the hearing examiner in December of 1965. Following that testimony, as before noted, WEBR and the Broadcast Bureau petitioned the Review Board to enlarge the issues. This was done and the examiner found in that regard that, while Seaport should have amended its application within 30 days of March 20, 1964, it was "highly unlikely that the amendment * * * would have had any effect whatsoever on the ultimate grant" to Seaport (Supp.App. 459). In any event, the examiner concluded that since Jasinski promptly notified his counsel of the developments and placed his trust in them to take the necessary steps in this regard, his failure to amend the application would not reflect adversely on his character qualifications. The Review Board took a slightly different view of this conduct and concluded that while "his good-faith reliance upon counsel [was] sufficient to avoid disqualification for character reasons, such reliance upon counsel [would] not absolve Jasinski from responsibility for this incident. Accordingly, a comparative demerit [was] assessed against Ultravision." (Supp.App. 406–07.)

It is WEBR's contention that under principal-agency law Jasinski's attempt to duck under his counsel's umbrella in an attempt to shield himself from full responsibility in the Seaport controversy is "patently unsound." Perhaps if this case depended upon the principles of agency law, WEBR's contention would be well founded. This, however, is not the case.

The Commission must determine not who is acting "within the scope of his authority" but who is acting with candor. It is not in the public interest for the Commission to attempt to put legal tags on a party's actions and im-

pute dishonesty merely on legal fictions. It is, however, in the public interest for the Commission to discover who is acting in good faith. Here the Review Board reviewed the past history of the Seaport incident, found, on the record, that there was support for the proposition that Jasinski acted in good faith reliance on his counsel, and decided that he should not be disqualified on character grounds. We see no apparent abuse of discretion in this finding and, therefore, are unable to gainsay it. In any event, we notice that the Board assessed a comparative demerit against Ultravision for the failure of its principal to report "changed circumstances" at the earlier Seaport proceeding. We are not convinced that this approach was unreasonable, arbitrary or capricious.

We reach this conclusion somewhat at ease for we are fully aware of the failure on the part of WEBR to report its interest in Courier Cable Company, organized and wholly owned by the parent of WEBR—the Buffalo Courier-Express, Inc. Furthermore, no disclosure of this interest was made until 17 months after the Cable Company's incorporation and with full knowledge of the Commission's new rule, 47 C.F.R. § 1.65 (1968), which came into effect on December 22, 1964, requiring the amendment of pending applications within 30 days of an event of "decisional significance." It is almost without dispute that, in view of the Commission's attitude toward diversification of control of the mass media, this interest in a cable television company would have been of decisional significance. Accordingly, we affirm again the Review Board's action as being within the area of discretion accorded them under the Communications Act and supported by substantial evidence in the record.

## II. THE FINANCIAL ISSUE

A. *Some General Principles of Law*

Section 308(b) of the Communications Act of 1934, as amended, 47 U.S.C. § 308(b) (1964), imposes a statutory duty on applicants for station licenses to include in their applications "such facts as the Commission by regulation may prescribe as to the * * * financial * * * qualifications of the applicant to operate the station * * *." This obligation must be met by the seekers of fortune in the communications area to enable the Commission to determine which applicant will best serve the public interest. It has been said, and there is no doubt, that

> An important element of public interest * * * affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts. That such ability may be assured the Act contemplates inquiry by the Commission, *inter alia*, into an applicant's financial qualifications to operate the proposed station.

FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940). With these policy statements in mind and with the full realization that it is the function of the Commission to insure the viability of a national television system, we note that the Commission, from time to time, has sought to establish financial requirement standards for applicants to meet before the valuable license is awarded. Prior to the 30th day of June, 1965 (the date on which the Commission announced the *Ultravision* standards, discussed *infra*) the Commission, in essence, required only the financial showing that an applicant was prepared to construct his station and operate it for a period of three months. However, with the increasing number of UHF station failures uppermost in the Commission's thoughts, a new standard was adopted requiring applicants for broadcast facilities to include in their statements regarding their financial qualifications a showing of an ability to construct and operate the facility for one year, and where the first year operation of that station would be dependent on advertising revenue, the applicant would be required to demonstrate the feasibility of obtaining such revenue. *See* Ultravision Broadcasting Co., 1 F.C.C.2d 544 (1965).

This so-called *Ultravision* standard was exceptionally pertinent to applications for UHF facilities in a market where there already existed three VHF stations. *See* Clarification of Applicability of New Financial Qualification Standards Concerning Broadcast Applications, 1 F.C.C.2d 550 (1965). The *Ultravision* standard was reaffirmed by the Commission in its statement on Financial Qualification Standards—Broadcast Applicants, 9 F.C.C.2d 26 (1967). It is not difficult to perceive the reasoning behind such reappraisal of financial standards. The physical number of stations on the VHF band is limited yet the aspirants for television licenses (and the concomitant advertising revenues) are virtually innumerable. With the advent of the discovery of UHF modulation, a new opportunity was opened to the communication-minded investor. This silver lining was clouded, however, by the economic realization of the difficulty of entering an area already settled by VHF stations. Investors, too eager to board the band-wagon of television success, were not cautious enough to see beyond the three month operation of the station —a period when advertising sales would begin to slacken—and thus station failures occurred. These new standards, then, were instituted to guard against premature station collapse and insure the continuing concept of free television.

### B. *The Particulars*

■ WEBR complains that the Board deviated from this new *Ultravision* standard in this case, and yet, in its argument it fails to describe what that deviation was. We find that the Board reviewed Ultravision's application with an eye on its estimated costs of construction and operation and its projection of first year revenue. The Board noted that Ultravision's cash needs for construction and operation of the proposed station for one year would amount to $441,165.88 (Supp.App. 395), and that its cash loans and estimated first year revenue would meet those needs. The Commission's Broadcast Bureau has concurred in these findings and in the examiner's characterization that any inadequacy in Ultravision's projections was "more theoretical than real." The Board also agreed with this statement and found that there was evidentiary support in the record to conclude that Ultravision's estimated costs were reasonable (Supp.App. 396). Judging from these findings and conclusions, then, it appears that WEBR's basic unhappiness is not that the Board deviated from a new standard but that its approval of the Ultravision application under the new standard was unfounded. We do not agree.

The Board discussed, at length, the cash needs of Ultravision; reviewed its reliances on loans and the likelihood of successful borrowing; inquired into its plans for tower costs, construction and remodeling of its studio, its prop costs and technical needs; and went into great detail to discover the basis of Ultravision's estimate of the first year's revenues. Moreover, it found a reasonable likelihood that Ultravision would receive those revenues based upon evidence of advertiser contact as well as a showing that present advertisers on Jasinski's radio station had evidenced an interest in buying UHF time. All this the Board inspected and appraised before approval of the application. Our review of the data, in detail, confirms the proposition of the Commission that the Board's findings are fair and reasonable and based upon a full record. Moreover, we feel that they truly reflect the apparent ability of Ultravision to build this station and operate it for one year without fear of financial destruction resulting in station failure or resale. These findings reflect the duty of the Commission and, since our inspection of the further arguments of WEBR uncovers no further need of discussion, it is our duty to affirm.

Affirmed.