**WADECO, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Belo Broadcasting Corporation, Intervenor.**

No. 78–1913.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1979.

Decided April 4, 1980.

Rehearing Denied Sept. 13, 1980.

Forbes W. Blair, Washington, D. C., for appellant.

Roberta L. Cook, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Gregory M. Christopher, Counsel, F. C. C., Washington, D. C., were on the brief, for appellee.

William J. Dempsey, Washington, D. C., with whom Frederick H. Walton, Jr., and Christopher J. Reynolds, Washington, D. C., were on the brief, for intervenor.

Before J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and MIKVA, Circuit Judges.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

Opinion for the court filed by Senior Circuit Judge LUMBARD.

Dissenting opinion filed by Circuit Judge MIKVA.

LUMBARD, Circuit Judge:

WADECO, Inc., petitions for review of a decision by the Federal Communications Commission, released August 24, 1978, that denied WADECO's application for a construction permit for a new television broadcast station on the ground that WADECO had misrepresented to the Commission, and withheld from it, significant information. WADECO claims that the Commission's findings of misrepresentation and withholding are unsupported by substantial evidence, and that its sanction—absolute disqualification instead of a demerit in the comparative hearing between WADECO and the applicant for renewal of the same license—was arbitrary and capricious. We disagree and dismiss the petition.

## I.

WADECO is a communications corporation located in Dallas, Texas. Its racially and ethnically diverse shareholders are Dallas residents who are active in community affairs; none of them holds ownership interests in other communications media. WADECO applied on July 1, 1971, for a permit to construct a new television broadcast station to operate WFAA-TV (Channel 8) in Dallas. If WADECO were granted the permit and the WFAA-TV license, two of its black shareholders intended to participate full-time in the station's affairs, and its president, James K. Wade, intended to serve as the station's general manager. The WFAA-TV license was held in 1971, and had been held since 1950, by Belo Broadcasting Corporation, which also held the licenses to WFAA-AM and KZEW(FM) (formerly WFAA-FM), and whose parent corporation owned several Texas newspapers. Belo had applied on May 3, 1971, to renew the WFAA-TV license, which was subject to expiration on August 1, 1977.

To obtain the construction permit, WA-DECO needed to show, among other things, its financial ability to construct the station and operate it for three months without revenues. WADECO therefore filed with its application a loan-commitment letter from a local mortgage company. Within one month, however, the mortgage company abrogated its commitment, and WADE-CO had to look for another source of financing.

In October 1971, Wade learned that the Castle Trust Company, Ltd., a bank in Nassau, Bahamas, had agreed to provide the necessary funds, and on November 5, Castle Trust sent to WADECO a letter which stated, "We are willing to arrange for a loan to you of up to U.S. $2,500,000, provided you are successful in obtaining the license for WFAA-TV." Castle Trust placed three conditions to the grant of the loan: that WADECO's shareholders endorse the note evidencing the loan, that its shareholders show an aggregate liquid net worth of at least $5 million, and that the documentation attendant to the loan be satisfactory to Castle Trust "and participating institutions." Wade was hesitant to rely on the letter, except as a last resort, because news reports which had recently linked Bahamian banks with "Las Vegas money" caused him to question the "cleanliness" of Castle Trust's loan. Wade therefore continued his search for funding; but none having been found by December 6 in banks in Dallas, Midland, and Lubbock, Texas, and in New York City, WADECO filed the Castle Trust letter as an amendment to its application.

In the early months of 1972, WADECO's Washington, D.C. counsel, Thomas Christensen, learned through informal conversations with the staff of the FCC's Broadcast Bureau that the Castle Trust letter was unsatisfactory to the Bureau in several respects. The staff disapproved, for one thing, of the Castle Trust requirement that WADECO's shareholders show a combined net worth of $5 million, for the staff insisted that it could not at that time assess WADECO's ability to satisfy this condition in the future. Also, the staff was troubled by the reference to "participating institu-

tions." If that reference meant, as it appeared to, that institutions other than Castle Trust would participate in the loan, the staff wanted to know who those institutions would be and whether they were financially able to participate. Moreover, by this time WADECO itself had become dissatisfied with Castle Trust's requirement that all the WADECO shareholders endorse the loan note, for some of the less affluent shareholders were reluctant to do so.

Christensen relayed these concerns to Castle Trust's attorney in a letter dated March 9, 1972. He asked that the net-worth requirement be dropped, and that the endorsement requirement be limited to several specific shareholders who were relatively wealthy. He also conveyed the staff's question whether other banks would participate in the loan, and added, "If this be true it will be necessary to name such other banks and to likewise demonstrate their abilities to contribute their share of the loan." Christensen sent a copy of this letter to Wade. Castle Trust's attorney, Paul Helliwell, replied on March 16 that Castle Trust would drop the net-worth requirement and would accept the endorsements of the several shareholders Christensen had named. As to the possibility of other participating institutions, Helliwell wrote:

"I can say with assurance that Castle would not make a loan of this size entirely for its own account. Therefore, if, as and when the loan was required, Castle Trust would (a) participate it in part to other banks, or (b) participate it in part to various settlements [i. e., trust funds] which Castle administers . . . or (c) to a combination of both. However, at this early point in time, Castle regards it as undesirable to identify the financial institutions to which it would participate . . . and under no circumstances will it now or in the future identify settlements which would be involved."

Wade did not receive a copy of Helliwell's letter but he did receive a copy of Christensen's reply, dated March 24, 1972, which

sympathized with Castle Trust's disinclination to name participating banks or settlements and which then suggested "that this problem might be obviated by simply deleting all references in the loan commitment letter to other participating institutions." Castle Trust agreed and, on April 4, it sent to WADECO a revised loan-commitment letter—with the endorsement requirement limited to certain named individuals and without the net-worth requirement or the reference to participating institutions— which WADECO filed with the FCC on April 11.

The revised letter notwithstanding, the Broadcast Bureau remained concerned about WADECO's financing, for it believed, as Martin Levy of the Bureau wrote to WADECO on May 5, 1972, that "while the Castle Trust Company, Limited has stated that it is 'willing to arrange for a loan,' this does not constitute a commitment by the bank to provide the funds." Wade forwarded this letter to Christensen. Having not received a response from WADECO, nor apparently from Christensen, Levy sent a second deficiency letter on September 12, 1972. Wade again forwarded the letter to Christensen, who thereupon wrote to Helliwell to attempt, in Christensen's words, "to derive a letter of intent . . . which will satisfy the [Commission]." He requested that Castle Trust substitute "We are willing to lend you . . ." for "We are willing to arrange for a loan to you . . .". Castle Trust refused, Helliwell replied, because the interest-rate problems of a Bahamian bank lending to a United States borrower deterred Castle Trust from "bind[ing] itself to making the loan directly." Thus, in response to Levy's letter, Christensen stated in an amendment filed with the FCC on October 12, 1972, that in his opinion the Castle Trust letter was "a valid commitment on the part of Castle Trust to make the stated funds available in the event that WADECO's application for a construction permit is granted." He pointed to the letter's detailing of interest rates and a repayment schedule as evidence of Castle Trust's intention to make the loan.

Wade did not see Christensen's October 12 statement before it was filed, for Christensen added it on his own initiative to several other items Wade had sent to him for filing with a pre-signed filing certificate. When Wade reviewed a copy of the complete amendment, he wrote to Christensen, "As I told you on the phone I don't consider [the Castle Trust letter] a valid commitment and still believe we should discontinue depending on this letter of credit." Wade had considered the Castle Trust letter useless since at least the preceding June. Wade's opinion, however, did not persuade Christensen to remove the letter from WADECO's file.

Christensen not having removed the letter, WADECO not having found any other financing, and the Broadcast Bureau obviously not being satisfied by Christensen's October 12 statement, the Commission designated on May 24, 1973, that one of the issues to be resolved in a comparative hearing on the applications of WADECO and Belo was whether Castle Trust's loan was actually available to WADECO. 40 F.C. C.2d 1131, 1133. Upon seeing the Commission's order, Wade wrote to Christensen, "Paragraph # 3 refers to the Castle Trust letter which has been null and void for over a year and which I have asked you to withdraw on more than one occasion. Will you please correct this item." Christensen still did not withdraw the letter, for WADECO still had not found another source of funding; rather, he filed on June 14 a "Petition to Delete Issues," which basically reiterated the argument he had made in the October 12, 1972 filing—that the details in the letter about interest and repayment evinced "a commitment by Castle Trust to loan funds" —and which therefore moved that "the issue as to the availability of the proposed bank loan should be deleted." Only in late June when Belo sought leave to depose Wade and other WADECO principals about the Castle Trust loan did Christensen attempt to remove the Castle Trust letter from WADECO's file. Because of WADECO's apparent eagerness to foreclose any inquiry into the Castle Trust loan, the administrative law judge refused WADECO's

leave to amend, the depositions were taken, and the above correspondence about the Castle Trust loan was produced.

Also elicited in the depositions was information about WADECO's shareholder list. Throughout these two years, WADECO had had on file with the FCC, as part of its application, a list of its shareholders. WADECO had amended this list as its shareholders changed, for § 1.65 of the FCC Rules holds an applicant responsible for "the continuing accuracy and completeness of information in a pending application." 47 CFR § 1.65 (1977). Thus, on July 11, 1972, WADECO had revised its shareholder list to show that Peter Manos had withdrawn as a shareholder, and on November 2, 1972, to show that Gilbert Curie had withdrawn. WADECO had not stated in these amendments, however, that Manos and Currie were among those shareholders whose endorsements were required by Castle Trust's loan-commitment letter, and that both, when they had withdrawn as shareholders, had also been released as endorsers. Nor obviously, had WADECO withdrawn the Castle Trust letter upon their releases, although Manos and Currie, whose combined liquid worth exceeded $4 million, were the major endorsers. Christensen, who drafted the Manos and Currie amendments, testified that he thought WADECO would satisfy its § 1.65 duty by reporting Manos' and Currie's withdrawals as shareholders without specifically reporting their release from the endorsement agreement, and that their releases did not compel him to withdraw the Castle Trust letter because he assumed that other shareholders of equal combined assets could be found and substituted as endorsers.

The administrative law judge conducted seventeen hearing sessions, between July 2, 1973, and August 6, 1975, addressed to twelve factual issues, including, in addition to whether WADECO was financially qualified to operate WFAA-TV, whether WADECO had failed to file accurate and complete information as required by § 1.65 of the FCC Rules, whether WADECO had misrepresented the availability of the Castle Trust loan, and whether, in light of the evidence adduced under those issues, WADECO was qualified to be an FCC licensee. On May 20, the administrative law judge concluded that WADECO lacked the basic character qualifications to be an FCC licensee, on the ground that WADECO had withheld and misrepresented significant information. 70 F.C.C.2d 1380. The Commission reached the same conclusion, and therefore disqualified WADECO, in an order released on August 24, 1978. 68 F.C.C.2d 1479. Belo's application for renewal, being otherwise unchallenged, was granted.[1]

## II.

■ WADECO argues that the Commission's finding of misrepresentation in the April 11 and October 12, 1972 filings and in the June 14, 1973 petition are unsupported by substantial evidence in the record, and that we must therefore vacate the Commission's decision. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). We disagree, for substantial evidence shows that WADECO skirted rather than answered the Broadcast Bureau's concern over "participating institutions," that WADECO twice asserted the firmness of Castle Trust's commitment after the release of Manos and Currie rendered the loan unobtainable, and that Wade, despite his protestations against the Castle Trust loan, acquiesced in each of these misrepresentations, which were executed by Christensen.

As to the April 11, 1972 filing, the evidence shows that WADECO's response to the Broadcast Bureau's concern about other participating institutions was seriously lacking in candor. WADECO argues that the revised loan-commitment letter, which at Christensen's suggestion dropped the reference to "participating institutions," was not misleading because one of Castle Trust's

---

1. The agency proceedings in this case spanned seven years; indeed, they did not result in a Commission order until over a year after the WFAA-TV license became subject to expiration.

options, according to Helliwell, was to participate the loan to trust funds which it administered rather than to other institutions. That argument is patently unacceptable. That Castle Trust might not have participated the loan to other institutions does not answer the question of who it would participate to if it chose that option, nor the question whether the FCC would find such other participants financially qualified to participate. The Bureau did not know Castle Trust's options; it knew only that Castle Trust no longer spoke of "participating institutions." Thus, simply dropping the reference did not, as Christensen hoped, obviate the Bureau's concern. Rather, it misrepresented to the Bureau the fact that Castle Trust might still participate the loan to other institutions.

WADECO also argues that even if the revised loan-commitment letter constituted misrepresentation, the misrepresentation should not be imputed to it, for it relied in good faith on Christensen's professional judgment. However, Christensen sent to Wade a copy of both his March 13, 1972 letter to Castle Trust, in which he conveyed the Bureau's inquiry and its import, and his March 24 reply to Helliwell's answer, in which he suggested that the reference to "participating institutions" be dropped and with which he enclosed the draft that Castle Trust adopted verbatim as its revised letter. Wade should have known, therefore, of the Bureau's concern and of Christensen's proposed solution. He should also have realized, as Christensen must have, that the revised letter misrepresented the possibility of other institutions participating, for there was nothing so esoteric about Christensen's suggestion that a prudent businessman could not readily understand its impropriety. Moreover, although Wade considered the Castle Trust letter useless by June 1972, Wade never objected to Christensen's sleight of hand in the letter's revision. Accordingly, we find substantial evidence in the record for the Commission's conclusions that WADECO falsely represented that no other institutions would participate and that Wade acquiesced in that misrepresentation.

As to the October 12, 1972 filing, the evidence shows that *any* representation that the Castle Trust loan was available to WADECO was a *mis*representation, for WADECO could no longer satisfy the condition in the loan-commitment letter that certain named shareholders, including Manos and Currie, endorse the loan note, Manos and Currie having by that time been released from their endorsement agreements. We cannot agree with WADECO's argument that Christensen simply fulfilled an advocate's duty in the October 12 filing by attempting to rebut the Bureau's contention that the Castle Trust letter did not constitute a valid commitment, after failing to persuade Castle Trust to revise the letter again. WADECO's argument that it should not be held responsible for this misrepresentation is also unpersuasive. It is undisputed that Christensen added his statement to the October 12 filing without Wade's approval, and that Wade, upon seeing it, wrote immediately to Christensen to urge that the Castle Trust letter be withdrawn. However, the salient fact is that WADECO did not attempt to withdraw the letter until June 1973, eight months after Currie had been released, and then only under the pressure of Belo's deposition requests. Thus, the Commission's inference that Wade acquiesced in the misrepresentation fostered by the October 12 filing is supported by substantial evidence.

As to the June 14, 1973 "Petition to Delete Issues," the evidence shows that WADECO again misrepresented the availability of the Castle Trust loan, for the petition repeated the arguments of the October 12 filing about the firmness of Castle Trust's commitment long after the release of Manos and Currie had disenabled WADECO from satisfying the conditions of the loan. WADECO argues that the two releases did not render the loan unobtainable because Christensen confidently assumed that other shareholders of equal means could be found and substituted to satisfy Castle Trust. The pious hope that the condition could be met through other shareholders could not be a substitute for the truth. WADECO

could not comply with the letter as it read, but WADECO never attempted to correct the letter to reflect Manos' and Currie's release.

WADECO also claims that the Commission unfairly faulted Wade for not repudiating his own counsel and communicating directly with the Commission once it was clear that Christensen persisted in relying on the Castle Trust letter. To be sure, Christensen filed the June 14 petition on his own initiative and over the implicit objection of Wade, who had been surprised to see the issue of the Castle Trust loan in the Commission's May 1973 designation order and had instructed Christensen to "correct this item." But WADECO's argument exaggerates the steps Wade needed to take; he need only have exercised greater firmness in ordering Christensen to withdraw the Castle Trust letter whose conditions WADECO could no longer satisfy, as Wade knew. In the absence of any evidence that he did so, the Commission's finding that Wade again acquiesced in Christensen's misrepresentation is supported by substantial evidence.

### III.

WADECO also argues that the Commission's finding of withholding in violation of § 1.65 is unsupported because the Commission received constructive notice that Manos and Currie had been released from the endorsement agreement. It is illogical to assume, WADECO suggests, that anyone would remain willing to endorse a note guaranteeing repayment of $2,500,000 after withdrawing as a stockholder of the recipient of the loan. Thus, since it did report the withdrawals, WADECO argues that the Commission should have logically assumed that Manos and Currie had been released. If it had really meant to withhold the information of Manos' and Currie's releases, WADECO asserts as a corollary, it would have withheld the information of their withdrawals. Furthermore, WADECO claims that it relied in good faith on Christensen's professional judgment that § 1.65 would be satisfied by reporting only the withdrawals.

■ We are constrained to reject WADECO's argument, for § 1.65 places the responsibility on the applicant to come forth with all the information needed to keep its file accurate and complete, not on the Commission to infer significant additional information from the less-than-complete information it receives. That Manos and Currie would not endorse the loan after withdrawing as shareholders, is, as WADECO suggests, a logical assumption. However, it is entirely reasonable for the Commission to require that when circumstances change an applicant notify it of all the changed details, and not leave significant information, even if logically inferable, to inference. Thus, it is no defense to WADECO's failure to notify the Commission specifically of Manos' and Currie's releases as endorsers to claim, even if rightly, that the Commission could have discerned their release from their withdrawals as shareholders. Moreover, the Commission has consistently held that the applicant, not the applicant's counsel, is responsible for complying with § 1.65. *Lorain Broadcasting Co.*, 18 F.C.C.2d 686, 688 (1969).

### IV.

■ Finally, WADECO argues that the sanction imposed upon it—disqualification—is arbitrary and capricious because it deviates from FCC precedent holding that a good faith reliance upon counsel protects an applicant from disqualification. We agree that such reliance on counsel may render too harsh a severe sanction like disqualification. *See Asheboro Broadcasting Company*, 20 F.C.C.2d 1 (1969); *cf. WEBR v. F.C.C.*, 420 F.2d 158, 167-68 (D.C. Cir. 1969). But we disagree with WADECO's premise—that its conduct amounted to no more than good faith, albeit misplaced, reliance on counsel—and we conclude that the sanction was justified and does not improperly deviate from precedent.

Viewed charitably, the evidence reveals that WADECO, and more specifically Wade, handled the application badly. Unable to secure a loan-commitment from a

domestic bank, it relied upon Castle Trust's, despite misgivings. Unable to draft a letter that satisfied both Castle Trust and the Broadcast Bureau, and ultimately unable to even to satisfy the conditions to the Castle Trust loan, it relied on Christensen's tactics, again despite Wade's misgivings. But its reliance was not uninformed; it appears that Wade knew of each of the misrepresentations either when they were made or shortly thereafter, and that his acquiescence allowed them to remain uncorrected in WADECO's file.

The Commission has stated that evidence of fraud, an intent to conceal, or other violations so numerous and serious as to reflect on the applicant's responsibility to be a licensee warrant disqualification. *Folkways Broadcasting Company*, 48 F.C. C.2d 723 (Rev.Bd.1974), review denied, F.C.C. 75–1017, September 9, 1975; *Gross Broadcasting Company*, 41 F.C.C.2d 720, 731 (1973). Given the findings of misrepresentation,[2] the Commission did not abuse its discretion in deciding that WADECO's conduct adversely reflected on its responsibility to be a licensee. At a minimum, the Commission was fully justified in determining that WADECO failed to act with candor. *See WEBR v. F.C.C., supra*. Less charitably, the Commission was justified to find that WADECO's offense and its proffered excuse resemble those in *Folkways Broadcasting Company, supra*, at 732, a decision on which the Commission relied in its August 24, 1978 order:

"Finally, we must reject Crowder's claim that an applicant is not subject to disqualification for misrepresentation because he did not personally write the pleadings or affidavits submitted to the Commission. The record clearly demonstrates that Crowder was aware that certain documents were false and misleading when they were filed on his behalf with the Commission. Therefore, the Board believes that Crowder should be disqualified for misrepresentations made to the Commission in his petition to enlarge is-

sues and his subsequent testimony relating thereto at the hearing."

*Cf. Vogel-Ellington Corporation*, 41 F.C. C.2d 1005 (Rev.Bd.1973), where the applicant's dereliction in providing information less crucial than the financial ability at issue in WADECO's application would have warranted, according to the Commission, at least a substantial demerit in a comparative hearing, and probably disqualification but for mitigating circumstances not present here.

In sum, the Commission did not impermissibly deviate from FCC precedent in disqualifying WADECO. Its sanction, therefore, is not arbitrary or capricious. *Garrett v. F.C.C.*, 513 F.2d 1056, 1060 (D.C. Cir. 1975).

Petition dismissed.

MIKVA, Circuit Judge, dissenting:

Disqualification is the maximum weapon in the Federal Communications Commission's licensing arsenal. It has been used in those egregious cases where the character of an applicant was drawn into substantial question. Since it essentially bars an applicant, and perhaps its principals, from ever obtaining a license, disqualification has been based on serious misconduct of the applicant: fraud, concealment, or serious derogation of accepted business behavior are the kinds of misdeeds described by the Commission as warranting this sanction. *See Gross Broadcasting Co.*, 41 F.C.C.2d 729, 731 (1973). *Compare Sea Island Broadcasting Corp. v. FCC*, 627 F.2d 240 (D.C. Cir. 1980) ("clear and convincing" standard of proof held to govern in an analogous proceeding). Because the misconduct established by this record is not worthy of such description, I believe that the disqualification sanction was arbitrarily imposed.

The applicant (WADECO) sought to join the contest for a television license held by Belo Broadcasting Corporation when that

---

2. Our conclusion that the Commission's sanction was not arbitrary is based upon the findings of misrepresentation. We would hesitate to approve so severe a sanction if WADECO's § 1.65 violation were the only basis for disqualification.

**130**

license came up for renewal. Belo was an established communications power in Texas and qualifying for that contest became a considerable task. The central difficulty for WADECO was in obtaining a financial commitment acceptable to the Commission. As the majority opinion points out, WADECO had and lost a loan commitment from a local financial institution. After WADECO lost the local commitment, it commenced negotiations for financing from Castle Trust Company, Ltd. (Castle), a Bahamian institution. Those efforts led to the trouble.

One of the key pieces of evidence upon which the Commission based its disqualification of WADECO was the commitment letter from Castle. The majority's opinion characterizes the evidence as showing that WADECO "skirted" the Commission's concerns about the letter and was "seriously lacking in candor." I do not believe that such descriptions are the necessary prerequisites of fraud and deception. In particular, I cannot find substantial evidence in the record to support the Commission's finding of misrepresentation on the part of WADECO. Not atypically, the bank sought to give itself as many options and openings as possible in its commitment letter. The Commission naturally sought to have the applicant present an unequivocal commitment. The negotiations between WADECO's counsel and Castle were equally typical. Their letters back and forth evince some traditional negotiations between a borrower and a lender. It was hardly the stuff of which fraud or concealment is formed.

Castle's letter of November 8, 1971 used the phrase "participating institutions" in describing its commitment. Upon hearing of the Commission's dissatisfaction with the letter, WADECO's counsel logically sought to negotiate solutions to the problems. Thus, he wrote Castle:

[T]he reference to participating institutions, in the next to the last line of the commitment letter, has given rise to the inquiry from the Commission as to whether or not the loan contemplated would be syndicated among the Castle Trust and one or more other banks. If this be true it will be necessary to name such other banks and to likewise demonstrate their respective abilities to contribute their share of the loan.

To this, Castle's attorney, Helliwell, replied:

I can say with assurance that Castle would not make a loan of this size entirely for its own account. Therefore, if, as and when the loan was required, Castle would (a) participate it in part to other banks, or (b) participate it in part to various settlements [*i.e.*, trust funds] which Castle administers, . . . or (c) to a combination of both. However, at this early point of time, Castle regards it as undesirable to identify the financial institutions to which it would participate, and the specific amount each would take, and under no circumstances will it now or in the future identify settlements which would be involved. Castle simply takes the position that it is well able to produce the financing when needed, subject, of course, to reasonable and proper terms and conditions which would be specified in its commitment letter.

Apprised of Castle's refusal to identify potential participating institutions "at this early point of time" and of the distinct possibility that Castle would not include other banks in the loan arrangement (using trust funds administered by Castle instead), WADECO's counsel proposed that Castle eliminate the reference to other participating institutions from the letter. Castle agreed to the deletion.

At this point, no one—not even Castle—knew whether other institutions would be used in granting a loan to WADECO. I cannot say, as the Commission concluded, that WADECO "falsely and deliberately indicated that Castle Trust would be the sole source of financing, whereas Castle Trust was actually to be but one of several potential participants." *Belo Broadcasting Corp.*, 68 F.C.C.2d 1479, 1490 (1978). Castle may very well have ended up as the only institution involved, given the trust fund option expressed in Helliwell's letter.

Surely the Commission does not suggest that there are not subsequent participations in loan commitments made to Commission licensees. This would be a different case if known participants had not been disclosed to the Commission, or if the commitment letter had not been amended when such other participants became known. That the letter did not clearly acknowledge the possibility of future participants is not fraud.

There is a second piece of conduct on which the Commission and the majority rely to justify WADECO's disqualification. That conduct stems from the withdrawal of two of WADECO's stockholders. The Commission was promptly notified of the withdrawals but was not similarly notified that these two former stockholders had also withdrawn as guarantors under the proposed loan commitment. The Commission found not only that WADECO by this conduct was guilty of violating Commission rules but also that this constituted an additional deception regarding the commitment letter. WADECO's counsel argued in vain that there was no deception since he had presumed that the Commission would know that the withdrawal of the stockholders included their withdrawal as guarantors. Such a consequence is a reasonable expectation in the business world. It is sophomoric for the Commission to characterize the failure to notify the Commission as "a deliberate action designed to mislead the Commission." *Belo Broadcasting, supra,* 68 F.C. C.2d at 1490. There is not a smattering of proof to buttress such a conclusion.

Throughout this proceeding, WADECO relied on reputable Washington communications counsel to represent its interests. Many of the decisions that led to the Commission's action were made by counsel without WADECO's participation or even knowledge. The principal stockholder of WADECO, James Wade, had no prior experience in dealing with the Commission. His actions and reactions to the proceedings indicate an understandable ambivalence.

On the one hand, he had personal doubts as to the adequacy of the Castle letter. Thus, he immediately wrote Washington counsel after the October 12, 1972 filing, reiterating his personal judgment that the Castle letter was not a valid commitment and that WADECO should discontinue depending on it. Over the next six months he requested several times that counsel withdraw the Castle letter. In May of 1973, when the Commission designated the WADECO application for hearing, specifying the availability of funds from Castle as a particular issue, Wade again wrote his counsel:

> Paragraph # 3 [of the Commission's Designation Order] refers to the Castle Trust letter which has been null and void for over a year and which I have asked you to withdraw on more than one occasion. Will you please correct this item.

On the other hand, Wade, being inexperienced in Commission matters, relied on the legal expertise of the Washington law firm WADECO had hired to handle its application, a law firm experienced in this area of law. Thus, when WADECO's counsel prepared the June 14, 1973 filing, which repeated the arguments presented in the October 12, 1972 filing, Wade deferred to the lawyer's professional judgment. As Wade testified at the initial hearing:

Q Did you tell him it was all right to go ahead and do it [file the June 14, 1973 Petition to Delete Issues]?

A If in his judgment it was the proper thing to do, I told him to go ahead and do it.

Q Now, Mr. Wade, despite your judgment as President of the company that this letter was null and void and not valid, if your lawyer felt like filing it with the Commission and representing to the Commission that it was valid, you had no objection to his doing that?

A I said to you, I don't know anything about law, especially about FCC law or how Washington lawyers operate and I left this up to them to do what they thought was proper. In their judgment.

Q Did their judgment and yours differ on this point?

A It obviously did, because I wrote them a letter.

Q And you were willing to accept different judgment that a null and void letter represented to the Commission [w]as a valid commitment. Is that correct?

A They were my lawyers. Until I fire them, I am going to do what they think is the best thing in their judgment.

Q And that's the way you think the obligation to make representation to the Commission should be adequately discharged, is that correct?

A Upon my proper, competent legal advice.

Q Now, did you believe that this was competent legal advice at this point?

A It was becoming questionable in my mind, but at that time, I relied on it.

(J.A. 228–29) Perhaps it was naive for Wade to continue to rely on his Washington counsel for this period of time, but this is no basis for disqualification. That sanction might have been justified if Wade were intentionally participating in misrepresenting the soundness of the Castle letter to the Commission, but the evidence does not support the Commission's inference that this was so.

Shortly after the June 14th filing, a petition was filed with the Commission which sought to withdraw WADECO's reliance on the Castle letter. Following a board of directors meeting in August 1973, WADECO began the process of acquiring new counsel.

I think the record reflects Wade's ambivalent and confused state of mind. It shows that he did not know what to do from the spring of 1972 to June of 1973, not that he was deliberately misleading the Commission during this time. It was his uncertainty that kept him from exercising "greater firmness" in ordering his counsel to withdraw the Castle letter. In short, the evidence does not adequately support the Commission's findings that WADECO misrepresented or intentionally concealed in-

formation. The record is replete with uncertainty, confusion, some dubious practices and a few mistakes, but fraud or its equivalent is not to be found.

Our review of the Commission's decision goes beyond the task of determining whether there was substantial evidence in the record to support its findings. We are obliged to consider, as well, whether the Commission's action was arbitrary in light of the ephemeral nature of the evidence on which it is based, the vicarious nature of WADECO's liability,[1] the severity of the sanction imposed, and past rulings of the Commission in similar circumstances. As with all agencies, the Commission cannot inexplicably act in an inconsistent fashion "giving credence to the charge that similar supplicants receive dissimilar dispensations." *FTC v. Crowther*, 430 F.2d 510, 514 (D.C. Cir. 1970); *accord, Greyhound Corp. v. ICC*, 551 F.2d 414, 416 (D.C. Cir. 1977); *Columbia Broadcasting System, Inc. v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971).

In *WEBR, Inc. v. FCC*, 420 F.2d 158 (D.C. Cir. 1969), this court said, "It is not in the public interest for the Commission to attempt to put legal tags on a party's actions and impute dishonesty merely on legal fictions." *Id.* at 167. The court upheld the Commission's determination that the applicant should not be disqualified because of good faith reliance on the advice of counsel. The Commission gave similar respect to a licensee's reliance on counsel in *Asheboro Broadcasting Co.*, 20 F.C.C.2d 1 (1969). In *Lorain Broadcasting Co.*, 18 F.C.C.2d 686 (1969), cited by the majority, the Commission said that an applicant's failure to report a significant matter, in violation of section 1.65 of the Commission's rules, could not be excused by relying on communications counsel. But despite this strong statement, the Commission did *not* disqualify the miscreant in *Lorain*. Moreover, as the ma-

---

1. The Commission concluded that Wade's "failure to correct known discrepancies was in effect a ratification of the representations made by counsel which can only be viewed as demonstrating Wade's own participation in a strategem [sic] designed to mislead the Commis-

sion." *Belo Broadcasting Corp.*, 68 F.C.C.2d 1479, 1487 (1978). The record does not support this conclusion. *See* pp. 131–132 *supra*. To say that there were "known discrepancies" begs the question of Wade's reliance on experienced counsel's professional judgment.

jority here concedes, the violation of section 1.65 in this case was technical and, standing alone, unlikely to warrant disqualification. *See* note 2 *ante.* I think it is beyond the discretion of the Commission to allow advice of counsel as a mitigating circumstance sometimes and not at other times, especially when the facts are as patently similar as they are here.

There is no doubt that the Commission could have evaluated the character issue in the measured forum of a comparative hearing.[2] Demerits could have been assessed against WADECO for whatever it did wrong or did not do right. This is what the Commission has done before. *Vogel-Ellington Corp.*, 41 F.C.C.2d 1005 (Rev.Bd.1973); *Gross Broadcasting Co., supra; Kittyhawk Broadcasting Co.*, 17 F.C.C.2d 729 (1973).

To apply the blunderbuss of disqualification in this case is to do violence to the precedents of both the Commission and this court. Because it can permanently bar the applicant and its principals from a communications license, because it tars people with a moral taint, the sanction of disqualification in this case is excessive to the purpose served. Worse yet, it may send out a false signal to those who might have the temerity to challenge a well-ensconced licensee at renewal time. Such a result is certainly not in the public interest which the Commission is charged to pursue.

I respectfully dissent.

---

2. It is ironic that the Commission did not afford WADECO the opportunity to participate in a comparative hearing under the circumstances. Following the complications with the Castle loan commitment, WADECO arranged for a different funding source and was found to be financially qualified by the administrative law judge in his initial decision. *See Belo Broadcasting Corp.*, 70 F.C.C.2d 1380, 1436 (1976). Yet the Commission subsequently declared in its decision:

Under all the circumstances in this proceeding, WADECO's failure to amend its application with regard to the changes in its financial proposal was obviously of decisional significance. For, if WADECO was not financially qualified, its application would be denied regardless of its comparative qualifications.

*Belo Broadcasting Corp.*, 68 F.C.C.2d 1479, 1485 (1978).