**CUMBERLAND BROADCASTING CORPORATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Respondent, James C. Sliger, Intervenor.**

**No. 79–1927.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 25, 1980.

Decided Oct. 24, 1980.

**4.** 5 U.S.C. § 552(b)(1)(7)(D).

Lawrence J. Bernard, Jr., Washington, D. C. and C. Michael Norton, Gallatin, Tenn., for petitioner.

Gregory M. Christopher, counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., were on brief, Sheldon M. Guttmann, counsel, F. C. C., Washington, D. C., for respondent.

James. K. Edmundson and Gerald P. McCartin, Arlington, Va., were on brief, for intervenor.

Before ROBINSON, WILKEY and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

This case raises the question whether the Federal Communications Commission's decision in *Belo Broadcasting Corp. (WFAA-TV)*, 68 F.C.C.2d 1479 (1978), upheld by this court in *WADECO, Inc. v. FCC*, 628 F.2d 122 (D.C.Cir.1980) (2–1 decision), mandates disqualification whenever an applicant for a broadcast license acquiesces in improper conduct of an attorney. We conclude that sensible reading of *WADECO* impels the Commission to resist automatic resort to the disqualification sanction, and we affirm the Commission's decision.

The Commission granted the application of James C. Sliger for a new FM broadcast station in Athens, Tennessee, and denied Cumberland Broadcasting Corporation's mutually exclusive application. In this appeal Cumberland contends that reasoned decisionmaking, encompassing a requirement of similar treatment for similarly situated applicants, demanded Sliger's disqualification. After setting out the relevant facts, we explain our conclusions that the Commission's decision (1) presents a well-reasoned analysis of the applicant acquiescence in attorney misconduct issue, and (2) in all respects pertinent to this appeal, merits the court's approbation.

## I. Facts

Cumberland Broadcasting Corporation is the licensee of WLAR, an AM station in Athens, Tennessee. James C. Sliger was WLAR's contract engineer. In November 1975, Sliger applied for a license to operate an FM station that had become available in Athens. The events relevant to this appeal, all occurring during the first half of 1976, are summarized below.

| | |
|---|---|
| *Mid-February* | Sliger met with two Cumberland principals and Frank Woods, Cumberland's Tennessee counsel. Woods told Sliger that Cumberland intended to file a competing application for the FM station and offered to buy out Sliger's interest. Sliger refused. |
| *Mid-February through March* | Cumberland and Sliger continued to negotiate about the approaching FM controversy. |
| *Mid-March through late-March* | Sliger learned that the community ascertainment survey Cumberland was preparing for its FM application might contain false information. Sliger reported what he had learned to his counsel, Perry. Perry advised that if the survey were in fact false, Sliger might be able to claim that Cumberland filed the FM application only to impede Sliger's application. In addition, Perry suggested that Sliger might consider filing for Cumberland's AM station, which was due for renewal. |
| *March 29* | Cumberland filed a renewal application for the AM station. |
| *April 1* | Cumberland filed an application for the FM station. |
| *April 6* | Sliger resigned from his position at WLAR, as he had agreed to do if Cumberland filed a competing FM application. A list of the community leaders purportedly contacted for Cumberland's ascertainment survey was made available to Sliger at WLAR's studios. Sliger became more certain that the survey had not in fact been made. |
| *April 8* | Sliger called the Washington, D.C. law firm of Midlen and Reddy to discuss filing an application for Cumberland's AM station. He asked if he could hire the firm for a "momentary consultation." The lawyers at Midlen and Reddy refused to advise Sliger unless they were retained as counsel. Sliger was unwilling to retain the firm. |
| *Mid-April* | Sliger decided to apply for Cumberland's AM station. |
| *April 22–26* | Sliger obtained affidavits from ten community leaders who stated that they had not been interviewed by Cumberland. |

April 27 — Perry told Sliger he was going to Washington, D.C. and planned to visit Cumberland's counsel, William Bernton, to see if the FM controversy could be settled before Sliger filed his AM application. Sliger was concerned about this tactic and asked Perry if it was proper. Perry assured him it was, since the FCC favored settlement. Still concerned, Sliger asked if Perry could get another opinion. Perry replied that he had already checked the matter out and that this was normal procedure.

May 1 — Perry and Sliger met to complete Sliger's AM application. Sliger again asked Perry whether it was proper to visit Cumberland's counsel. Perry again said it was and told Sliger he would not file the AM application if he was able to settle the FM contest.

May 5 — Perry visited Bernton's office in Washington, D.C. He talked first with Gene Mallyck, Bernton's partner, who told him that Bernton was handling the case. Perry, Mallyck, and Bernton then had lunch together. Near the end of lunch Perry revealed some of the information Sliger had compiled against Cumberland. He indicated that the information could adversely affect Cumberland's qualifications to hold an FCC license if it were brought to the attention of the Commission.

After lunch Perry met privately with Bernton. The Administrative Law Judge (ALJ) and the Review Board accepted Bernton's account of this meeting. According to Bernton, Perry stated that if Cumberland would not dismiss its FM application then Sliger would file for the AM station and challenge Cumberland's character. Perry showed Bernton the completed AM application, the check for the filing fee, and one of the affidavits. Perry emphasized that Cumberland could escape these adverse consequences by withdrawing its FM application. Bernton did not respond to these statements, but at the close of the meeting Perry agreed not to file the AM application until Bernton had had a chance to talk to the Cumberland principals.

That evening Perry told Sliger that he had not filed the AM application and that he had agreed to defer filing it until after Bernton could talk to the Cumberland principals. Perry also said he had told Bernton that Sliger was not really interested in the AM station. Sliger was surprised and upset. He again asked Perry to discuss the matter with other counsel. Perry assured him he would but said they should first give Cumberland time to respond to the settlement offer.

May 7 — Woods, Cumberland's Tennessee counsel, contacted Perry and told him he had heard about Perry's May 5 meeting with Bernton. Perry told Woods that there were serious problems with Cumberland's application and that Cumberland should consider settling.

Perry told Sliger about this conversation with Woods. Sliger was concerned because the offer to Bernton was still outstanding and the AM application had not yet been filed. Perry mentioned the name of James Edmundson, a Washington, D.C. communications lawyer, as someone from whom they could get an independent opinion.

May 10 — Sliger called Samuel Miller, a Washington, D.C. communications lawyer. He described the situation to Miller. Miller told Sliger that "this is not the way that you do things."

May 11 — Sliger ordered Perry to seek the opinion of another lawyer. Perry arranged for a conference call with Edmundson, the lawyer Perry had mentioned to Sliger a few days earlier.

May 12 — Edmundson, Perry, and Sliger held a conference call. Edmundson expressed concern that Cumberland might have perceived Perry's approach as a threat and said he would not have approached Bernton that way. Sliger asked Edmundson to look further into the case so that they could decide upon a course of action.

May 13 — Pickel, a Cumberland principal, telephoned Sliger and asked him to meet him and Robert Hood, WLAR's general manager, for lunch. They agreed to meet.

Sliger called Edmundson for instructions. At first Edmundson advised Sliger not to attend the meeting. After discussing the matter, however, they agreed that Sliger should attend the meeting but act as a "good listener" and not commit himself to anything.

Sliger met Pickel and Hood for lunch. Near the end of lunch Pickel asked Sliger about his AM application. Pickel claimed Sliger repeated the threat to file his AM application if Cumberland did not withdraw its FM application. The ALJ and the Review Board, however, adopted Sliger's version of the meeting, which was that he told Pickel and Hood he had made no decision about the AM application.

Sliger reported to Edmundson what transpired at the lunch meeting. Edmundson was concerned that Pickel might misconstrue Sliger's statement that he had not yet decided whether to

*May 13*  file the AM application as a repetition of Perry's threat. Edmundson advised Sliger to tell Pickel he had definitely decided not to file the application.

Sliger was unable to reach Pickel but he met with Hood and told him he would not file the AM application.

*May 14*  Sliger told Pickel, and Edmundson told Bernton, that Sliger was not going to file the AM application.

## II. Commission Proceedings

The Commission set the FM applications for a consolidated hearing. Cumberland challenged Sliger's character, claiming that Sliger had threatened to file a strike application against Cumberland's AM station. The ALJ denied a request to add a character issue to the hearing, but the Review Board reversed on appeal. On remand, the ALJ granted the license to Sliger. The ALJ found that Sliger's attorney had threatened to file a strike application against Cumberland and that Sliger was responsible for his attorney's actions. Nevertheless, since the threats were short-lived and since Sliger himself had behaved cautiously, the ALJ assessed only a comparative demerit of "average (not substantial) intensity" against Sliger. Despite this demerit the ALJ found Sliger the "clear comparative choice" since Sliger owned no other broadcast facilities (while Cumberland owned an AM station in the same community) and planned to work full-time at the station (while no Cumberland principal planned to work at the station). Cumberland, moreover, received a demerit for its plans to duplicate programming between the AM and FM stations.

The Review Board, although it increased the demerit imposed on Sliger to one of "substantial" intensity, affirmed the grant of the FM license to Sliger.[1] The heightened demerit was insufficient to overwhelm the comparative evaluation, the Board concluded, because the qualifications comparison was "not close." One member dissented. While characterizing Sliger's candor in Commission proceedings as "commendable," 70 F.C.C.2d at 1577, the dissenting Board member believed it would thwart Commission policy to withhold disqualification where an applicant displays "knowing willingness to accept the fruit of [his] agent's misconduct," *id.* at 1575. The threat, once made, the dissenting member reasoned, was not susceptible to mitigation by subsequent remorse and retraction.

## III. Discussion

Cumberland presses the argument that no significant distinction separates the relationship of Sliger to attorney Perry's misconduct from the relationship of the applicant in *WADECO, supra*, to its attorney's wrongdoing. We disagree.

The attorney in *WADECO* misrepresented the availability of the applicant's loan commitment. That information was relevant to the applicant's qualifications. The misrepresentation, although inescapably evident to the applicant, went unchecked for eight months. As the Commission viewed it, the applicant took a "see no evil" approach to counsel's misconduct.[2]

The misconduct here involved settlement tactics, an area in which a lay person might reasonably assume attorneys possess special expertise. Sliger reluctantly participated in attorney Perry's plan to induce Cumberland to dismiss its competing FM application. He acquiesced in Perry's threat to file an application for an AM station in competition with Cumberland's renewal application. Sliger had misgivings but, unlike the applicant in *WADECO*, he did not let them fade from view or defer sheepishly to his attorney's assurances. With dispatch, Sliger sought advice from other counsel and, promptly upon securing that advice, he withdrew Perry's threat. The episode ran its course in eight days.[3] Under the cir-

---

1. The Review Board decision, released January 31, 1979, is reported at 70 F.C.C.2d 1565.

2. Brief for Appellee at 15, Cumberland Broadcasting Corp. v. FCC.

3. The threat was made by Perry May 5, 1976 and withdrawn by Sliger May 13. Less than two months elapsed from Perry's initial suggestion of a competing AM application (late March) to Sliger's announcement that he would not file the application. The record provides no basis for concluding that, prior to April 27, Sliger understood that Perry contemplated using the application to threaten Cumberland.

cumstances, it would have been exorbitant to train on Sliger "the maximum weapon in the Federal Communications Commission's licensing arsenal." *WADECO*, 628 F.2d at 129, dissenting op. at 1.[4]

### Conclusion

The Administrative Law Judge and the Review Board, in articulate decisions, found Sliger "a one-sided winner" under both the diversification and integration criteria. The applicant acquiescence in attorney misconduct issue was treated with appropriate gravity. Sliger bore a substantial demerit for the AM application episode. But even that strong sanction, the Review Board reasonably concluded, did not "tip the scale in Cumberland's favor." 70 F.C.C.2d at 1574. The Board's decision is supported by substantial evidence, no arbitrary action or caprice is reflected in the Commission's performance or the order denying the FM license to Cumberland and awarding it to Sliger. Accordingly, we affirm.

*So ordered.*

---

4. The *WADECO* majority tied its decision to the particular circumstances presented. The court agreed that "reliance on counsel may render too harsh a severe sanction like disqualification." 628 F.2d at 128.

*Central Florida Enterprises, Inc. v. FCC*, 598 F.2d 37 (D.C.Cir.1978), *amended on denial of rehearing and rehearing en banc*, 598 F.2d 58 (1979), *cert. dismissed*, 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979), also relied on by Cumberland, indicates no infirmity in the Commission's proceedings in this case. In *Central Florida*, the court's analysis revealed sharp disagreement with the Commission's policy of according a strong preference to incumbents in comparative proceedings. No such concern exists here. Moreover, the mitigating factors in this case (Sliger did not initiate the threat, he continuously questioned counsel about its propriety, and he ultimately engaged new counsel upon whose advice he withdrew the threat), unlike those identified by the Commission in *Central Florida*, had the endorsement of this court. *See WEBR, Inc. v. FCC*, 420 F.2d 158 (D.C.Cir.1969). Further, the court in *Central Florida* determined only that the incumbent's conduct warranted more than a "slight demerit" and that the Commission had not adequately explained why the incumbent prevailed. The case was remanded for reasoned decisionmaking, not for automatic disqualification of an applicant.